**Slip Op. 09-55**

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

HABAS SINAI VE TIBBI GAZLAR             :
  ISTIHSAL ENDUSTRISI A.S.,

                                     :

                     *Plaintiff*,

                                       :

    v.

                                       :

UNITED STATES,

                                  :       Court No. 05-00613

                    *Defendant*,

                                       :

    and

                                       :

NUCOR CORPORATION, GERDAU
AMERISTEEL CORPORATION, and            :
COMMERCIAL METALS COMPANY,

                                       :

             *Defendant-Intervenors*.
_____

[Sustaining in part U.S. Department of Commerce's remand determination in administrative review of antidumping duty order.]

                                               Dated:  June 15, 2009

    Law Offices of David L. Simon (David L. Simon), for Plaintiff.

    Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Richard P. Schroeder); Scott D. McBride, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

    Wiley Rein LLP (Alan H. Price, John R. Shane, and Maureen E. Thorson), for Defendant-Intervenors.

**OPINION**

RIDGWAY, Judge:

Pending before the Court are the Final Results of Redetermination Pursuant to Court Remand, filed by the U.S. Department of Commerce pursuant to the decision in <u>Habas</u>. *See generally* Final Results of Redetermination Pursuant to Court Remand ("Remand Determination"); <u>Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States</u>, 31 CIT ____, 2007 WL 3378201 (2007) ("<u>Habas</u>").

<u>Habas</u> remanded to Commerce two issues concerning the agency's analyses in the seventh administrative review of the antidumping duty order on Certain Steel Concrete Reinforcing Bars From Turkey: (1) Commerce's use of annual Period of Review ("POR") average costs (rather than Habas' quarterly costs) in the agency's "sales-below-cost" analysis, and (2) Commerce's use of invoice date (rather than contract date) as the date of sale for Habas' U.S. sales in the agency's antidumping duty margin calculations. *See* <u>Habas</u>, 31 CIT at ____, ____, 2007 WL 3378201 * 5, 8.

In its Remand Determination, Commerce reaffirmed its earlier decision to use POR average costs, rather than quarterly costs. However, Commerce reversed its prior determination on the date of sale issue, concluding that contract date is the appropriate date of sale. *See generally* Remand Determination.

In its comments on the Remand Determination, Habas requests that the quarterly costing issue be remanded once again, but argues that the Remand Determination on the date of sale issue should be sustained. *See generally* Brief of Plaintiff Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi

A.S. Concerning Remand Final Determination of Department of Commerce ("Pl.'s Brief"); Reply

Brief of Plaintiff Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. Concerning Remand Final

Determination of Department of Commerce (Pl.'s Reply Brief").

The Domestic Producers – Defendant-Intervenors Nucor Corporation, Gerdau Ameristeel

Corporation, and Commercial Metals Company – oppose Habas on both counts. According to the

Domestic Producers, the Remand Determination should be sustained as to the quarterly costing

issue, while the date of sale issue should be remanded to the agency once more. *See generally*

Defendant-Intervenors' Comments on the Remand Results ("Def.-Ints.' Brief"); Defendant-

Intervenors' Supplemental Brief ("Def.-Ints.' Reply Brief").

The Government maintains that Commerce has complied fully with the Court's instructions

in Habas, and that the Remand Determination is supported by substantial evidence and is otherwise

in accordance with the law. The Government therefore contends that the Remand Determination

should be sustained in its entirety. *See* Defendant's Response to Comments Regarding Remand

Redetermination ("Def.'s Response Brief") at 4.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[1] For the reasons set forth below, the

Remand Determination is sustained as to Commerce's determination on the use of contract date as

the date of sale. However, as to the issue of quarterly costs *versus* POR-average costs, this matter

must be remanded to the agency yet again.

---

[1]All citations to federal statutes herein are to the 2000 edition of the United States Code. Similarly, all citations to federal regulations are to the 2003 edition of the Code of Federal Regulations.

## I. **Background**

This action arises out of the seventh administrative review of the antidumping duty order on imports of steel concrete reinforcing bar ("rebar") from Turkey. In the Preliminary Results of the administrative review, Commerce made a preliminary determination that the dumping margin for Habas was 26.07%. *See generally* Certain Steel Concrete Reinforcing Bars from Turkey; Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review and Notice of Intent to Revoke in Part, 70 Fed. Reg. 23,990 (May 6, 2005) ("Preliminary Results"); *see also* Habas, 31 CIT at ____, 2007 WL 3378201 * 2.

Following publication of the Preliminary Results, Habas' advocacy before Commerce focused principally on the two issues in dispute in this action – whether Commerce erred in using annual POR-average costs (rather than Habas' quarterly costs) in the agency's sales-below-cost analysis, and whether Commerce erred in using invoice date (rather than contract date) as the date of sale for Habas' U.S. sales in the agency's antidumping duty margin calculations. In the Final Results, Commerce rejected Habas' arguments on both issues, and left Habas' dumping margin unchanged at 26.07%. *See generally* Certain Steel Concrete Reinforcing Bars From Turkey: Final Results, Rescission of Antidumping Duty Administrative Review in Part, and Determination to Revoke in Part, 70 Fed. Reg. 67,665 (Nov. 8, 2005) ("Final Results"); *see also* Issues and Decision Memorandum for the Antidumping Duty Administrative Review on Certain Steel Concrete Reinforcing Bars from Turkey – April 1, 2003, through March 31, 2004, 2005 WL 3054566 (Nov.

8, 2005) (Pub. Doc. No. 256) ("Decision Memorandum").[2]

This action followed, contesting Commerce's determination in the Final Results. *See generally* <u>Habas</u>, 31 CIT ____, 2007 WL 3378201.[3]  In <u>Habas</u>, the Court granted in part Habas' Motion for Judgment Upon the Agency Record, remanding to Commerce for further consideration the issues of quarterly costs and date of sale. *See generally* <u>Habas</u>, 31 CIT at ____, ____, 2007 WL 3378201 * 5, 8.

In its Remand Determination, Commerce reaffirmed the agency's earlier decision to use annual POR average costs – rather than quarterly costs – in its sales-below-cost analysis. *See generally* Remand Determination at 1-19, 21-40, 49.  However, Commerce reversed its earlier determination on the date of sale issue,  concluding that contract date is the appropriate date of sale for use in the agency's antidumping duty margin calculations. *See generally* Remand Determination at 1-2, 19-21, 40-49.  Commerce therefore recalculated Habas' dumping margin, which now stands at 22.53%. *See* Remand Determination at 1-2, 21, 49.

---

[2]Because this action was remanded to Commerce in <u>Habas</u>, there are now two administrative records filed with the court – the initial administrative record (which comprises the information on which the agency's Final Results were based), and the supplemental administrative record (on which the Remand Determination was based).  Moreover, because confidential information is included in both administrative records, there are two versions of each – a public version and a confidential version.  Citations herein to public documents in the initial administrative record are noted as "Pub. Doc. No. ____."  There are no citations to confidential documents in the initial administrative record, or to any documents in the supplemental administrative record.

[3]A pending companion case challenges the results of the same proceeding at issue here – the seventh administrative review. *See* <u>Nucor Corp. v. United States</u>, No. 05-00616 (Ct. Int'l Trade filed Nov. 14, 2005).  In addition, an action contesting the results of the sixth administrative review (covering 2002-2003) also remains pending. *See* <u>Gerdau AmeriSteel Corp. v. United States</u>, No. 04-00608 (Ct. Int'l Trade filed Dec. 6, 2004); *see also* <u>Gerdau AmeriSteel Corp. v. United States</u>, 519 F.3d 1336 (Fed. Cir. 2008).

## II.  **Standard of Review**

In reviewing a challenge to Commerce's final determination in an antidumping case, the agency's determination must be upheld unless it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(I); *see* Elkem Metals Co. v. United States, 468 F.3d 795, 800 (Fed. Cir. 2006).[4]

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Moreover, any determination as to the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera, 340 U.S. at 487-88).  On the other hand, the mere fact that "it [may be] possible to draw two inconsistent conclusions from evidence in the record . . . does not prevent Commerce's determination from being supported by substantial evidence."  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966) (same).

---

[4]*See also* Elkem Metals Co. v. United States, 27 CIT 838, 842, 276 F. Supp. 2d 1296, 1301 (2003) ("The same standard of review applies to the review of a remand determination as to the review of the original determination."); Bethlehem Steel Corp. v. United States, 26 CIT 1003, 1006, 223 F. Supp. 2d 1372, 1375 (2002) (same).

### III.  **Analysis**

Habas and the Domestic Producers each challenge one aspect of Commerce's Remand Determination.  Specifically, Habas takes issue with Commerce's continued adherence to the use of a single cost-averaging period, contemporaneous with the period of review (POR), in the agency's sales-below-cost analysis, while the Domestic Producers dispute Commerce's decision to reverse its earlier determination and use contract date (rather than invoice date) as the date of sale in its antidumping duty calculations.

Both issues are discussed in turn below.  For the reasons detailed there, Habas' challenge to the Remand Determination is sustained, and this matter is remanded to Commerce for a second time, for further consideration of the issue of the use of POR-average costs *versus* quarterly costs.  On the other hand, the Domestic Producers' challenge to Commerce's decision to use contract date (rather than invoice date) as the date of sale is rejected, and the Remand Determination on that issue is sustained.

A.  Commerce's Determination on Use of Quarterly Costs *versus* POR-Average Costs

In order to make fair comparisons between U.S. sales and normal value, and between home market sales and costs, Commerce must determine the appropriate time period(s) for its weighted-average cost calculations.  In the instant case, Habas claims that Commerce's use of POR-average costs created a mismatch between sales and costs which distorted the comparisons between U.S. price and normal value.  *See* Habas, 31 CIT at ____, 2007 WL 3378201 * 3.  According to Habas, Commerce's use of POR average costs "causes a 14% increase in normal value . . . which, in turn, inflates the dumping margins by 20%."  *See* Pl.'s Brief at 4.

The Remand Determination at issue here is, in part, the result of the Government's request

for a voluntary remand on the issue of POR-average costs *versus* quarterly costs.  Habas vigorously

opposed the request for a voluntary remand, claiming that Commerce "simply want[ed] another

chance to come up with a rationale to support its previous decision," and cautioning against giving

Commerce "another chance to find a theory that will support [its] predetermined result," by allowing

the agency yet "another bite at this apple."  *See* Habas, 31 CIT at ____, ____, 2007 WL 3378201

\* 4 (internal quotation marks and citations omitted).   The source of frustration with the

Government's request for a voluntary remand, explained Habas, was that:

> During the administrative proceeding, Commerce issued a preliminary result based
> on a particular rationale.  Habas' case brief addressed Commerce's rationale.
> Commerce then chose to keep the same result, but to formulate a new rationale [in
> its Final Results]. . . . In its principal brief [filed with the Court], Habas exposed the
> errors of Commerce's rationale.  Now, having read Habas' principal brief, the
> government would like another chance before this court to formulate a more
> persuasive rationale.

Habas, 31 CIT at ____, 2007 WL 3378201 \* 4 (internal quotation marks and citations omitted).

Habas instead sought a directed remand, urging the Court to require Commerce to recalculate Habas'

dumping margin using Habas' quarterly costs (rather than POR-average costs).  *See* Habas, 31 CIT

at ____, 2007 WL 3378201 \* 4-6.

Notwithstanding Habas' request, the Court granted the Government's request for a voluntary

remand in Habas, noting that – under SKF – an agency is generally entitled to a voluntary remand

to reconsider its position if the agency's concern is substantial and legitimate.  *See* Habas, 31 CIT

at ____, 2007 WL 3378201 \* 4 (*citing* SKF USA, Inc. v. United States, 254 F.3d 1022, 1028-29

(Fed. Cir. 2001)).  Habas also took note of the Government's assurances that Commerce intended

to "take a fresh look" at the issue on remand.  *See* Habas, 31 CIT at \_\_\_\_, 2007 WL 3378201 * 5;

*see also* Pl.'s Brief at 5-6.

Habas now asserts that – in its Remand Determination – Commerce has once more "shown

itself unwilling to consider this issue without prejudgment," and has "made no attempt to 'take a

fresh look' at quarterly cost, nor did it 'consider anew' its methodologies."  *See* Pl.'s Brief at 6.

Habas essentially claims that the Remand Determination has yet again "moved the goalpost" on the

issue of the use of multiple cost-averaging periods, and that Commerce "continue[s] to rely on

flawed tests, illogical propositions, and selective statistics."  *See* Pl.'s Brief at 39.  Although they

are strong, there is at least some truth to Habas' charges.

As a threshold matter, four interrelated overarching points bear note.

First, throughout its briefs, the Government repeatedly alludes to the general "virtue" of

Commerce's standard practice of using annual (POR) average costs in its sales-below-cost analysis

– *i.e.*, that the use of annual POR-average costs tends to smooth out swings in production costs that

respondents may experience over shorter periods of time.  *See*, *e.g.*, Def.'s Response Brief at 13

(noting that "the use of annualized costs 'normally evens out swings in production costs'" that may

occur over shorter periods) (*quoting* Remand Determination at 12).[5]  At the same time, the

Government strives to depict Habas as seeking to carve out for itself some novel, aberrant,

_____

[5]*See also* Def.'s Response Brief at 15 (citing Commerce's "trusted annual methodology"),
16 (referring to Commerce's "standard and predictable annual methodology," and to a methodology
used to "calculate cost of production upon a consistent, and predictable annual basis"), 23 (citing
the "smooth[ing] out over time" of "volatility and overall trends" as "one of the benefits of
calculating annual-based costs"); *see generally* Fujitsu General Ltd. v. United States, 88 F.3d 1034,
1038-39 (Fed. Cir. 1996) (noting that use of a single cost period generally "smooths out"
distortions").

extraordinary "special exception" to Commerce's standard practice – going so far as to characterize

the relief that Habas seeks as "a *dramatic* change from Commerce's normal practice."  *See* Def.'s

Response Brief at 7, 8 (emphasis added).[6]

As the Government acknowledges, however, Habas is not challenging in principle

Commerce's standard practice of using annual POR average costs.  *See* Def.'s Response Brief at 7

(noting that "Habas does not challenge the reasonableness of Commerce's general practice"), 13

(noting that Habas does not claim that "Commerce's annual-based methodology is impermissible").

Nor – contrary to the Government's implication[7] – is Habas attempting to fashion and then exploit

---

[6]*See also* Def.'s Response Brief at 12 (arguing that what Habas seeks is a "[m]ethodology . . . [t]hat [i]s [i]nconsistent [w]ith Commerce's [n]ormal [p]ractice"), 13 (asserting that Habas seeks "an exception"), 15 (referring to "the alternative quarterly methodology proposed by Habas"), 19 (characterizing relief sought by Habas as "a radical change from Commerce's practice," and predicting that Habas' approach would "increase dramatically" the use of shorter cost-averaging periods).

[7]Unlike Commerce itself (as well as the Domestic Producers and, of course, Habas), the Government fails to acknowledge even the existence of Commerce's long-recognized and well-established exception permitting the use of multiple, shorter cost-averaging periods in certain circumstances.  *Compare* Def.'s Response Brief *with*, *e.g.*, Remand Determination at 14-16 (surveying various past cases involving requests for use of multiple, shorter periods), 28 (acknowledging that Commerce in this case has "refine[d]" its criteria for use of multiple, shorter periods, as compared to criteria applied in past cases); Def.-Ints.' Brief at 13-15 (explaining how Commerce here "refined its traditional test for determining whether to employ multiple cost periods"; comparing and contrasting "[t]he test formerly employed" by Commerce to determine whether to use multiple cost-averaging periods with test employed by agency in this review); Pl.'s Brief at 2 (noting that "[t]he precedents when this review was underway . . . required quarterly costing (or some other form of multiple cost-averaging periods) when the respondent's cost to acquire the input of a 'single-primary-input' product 'increased significantly' during the POR"), 6 (distilling "the test for quarterly cost ('multiple averaging periods') for ordinary industrial products" at time when instant administrative review began), 16-17 (discussing "consistent and predictable test" for multiple cost-averaging periods used by Commerce "[f]or nearly 20 years before the Turkish rebar case"), 26 (referring to "Commerce's long-standing approach" to multiple cost-averaging periods), 39 (referring to Commerce's "then-prevailing single-primary-input test for multiple averaging periods"); Pl.'s Reply Brief at 2 (citing select "precedents favoring shorter cost-

some creative, brand new, unprecedented, one-off "loophole" or caveat to Commerce's standard practice.

Instead, Habas has sought merely to demonstrate that it falls within the pre-existing, longstanding, and well-established exception to the Government's standard practice – an exception that provides for the use of multiple, shorter cost-averaging periods by respondents that meet certain heretofore relatively clear-cut criteria, in situations where the fundamental underlying "virtue" of Commerce's standard practice *does not* hold true (*i.e.*, where the use of annual POR-average costs *does not* serve to "smooth out" swings in production costs, but – rather – has a distortive effect). *See* Pl.'s Reply Brief at 2 (observing that "Habas is simply asking Commerce to apply a well-established test to Habas' facts"), 3 (same).

The second threshold observation is related to the first. As noted immediately above, Habas has here sought simply to avail itself of the longstanding, well-recognized exception to Commerce's standard practice – an exception permitting the use of multiple, shorter cost-averaging periods under

averaging periods, . . . following through the judicial precedents . . . and multinational (WTO) precedent"; explaining that "[t]here is, in fact, abundant administrative, judicial and multinational precedent favoring shorter cost-averaging periods during periods of exceptional cost surges"), 4 (discussing "all the precedents, from Brass Sheet and Strip through Pasta from Italy, Fujitsu General and Thai Pineapple"), 9 (noting that "shorter cost-averaging periods originated" in "the original Brass Sheet cases"; noting use of consistent test "[i]n Brass Sheet, as in Pasta from Italy and SRAMs from Taiwan, Fujitsu General, . . . and Thai Pineapple"), 10-11 (explaining that "the question of whether a change in cost over the POR was 'significant' has always been the key question underlying shorter cost-averaging periods"; "[i]n all of the precedents, Commerce compared the costs across the POR; it is the core of a long-standing and clearly articulated test"), 11 ("comparing costs at the beginning of the POR to costs at the end of the POR "is precisely the way in which the test was applied in Brass Sheet, in Pasta from Italy, and in all the other cases involving shorter cost-averaging periods"), 15 (referring to "[Commerce's] own precedents and those of the courts and the WTO").

certain specific circumstances.  As Habas quite properly complains, however, Commerce's test for

the use of multiple, shorter cost-averaging periods has (to say the least) been a constantly moving

target in the administrative review at issue here.  *See generally* section III.A.1, *infra*; *see*, *e.g.*, Pl.'s

Brief at 2 (summarizing evolution of Commerce's approach over course of this proceeding, and

emphasizing that agency's "approach [in this case] is completely different in kind from that of all

previous cases"), 6-10 (reviewing evolution of Commerce's approach in this case).[8]

The third threshold observation is related to the second.  The Government's brief is peppered

with various references casting aspersions on Habas' motives in taking the positions that Habas has

taken in this case.[9]  Ordinarily, it would suffice simply to dismiss such finger-pointing with the

---

[8]*See also*, *e.g.*, Pl.'s Brief at 14 (noting that Commerce has seemingly "repudiated its long-standing single-primary-input test"), 15 (noting that "in all of the previous cases, Commerce analyzed the movement of cost *across* the period of review," and underscoring that "Commerce never explains why a test that was appropriate for 20 years' of precedent is suddenly irrelevant"), 16-17 (explaining that Commerce apparently has now "discarded the single-primary-input test," but that "[f]or nearly 20 years before the Turkish rebar case, Commerce had a consistent and predictable test"; "[f]or normal industrial products, the single-primary input criterion was workable"; "[t]he issue of whether cost of the input had experienced a consistent and significant increase or decrease served well"), 26 (asserting that "Habas experienced a 28% increase in the cost of its single primary input across the POR," which "would have satisfied the threshold inquiry for multiple cost-averaging periods" under "Commerce's long-standing approach"; but, "[t]o avoid this result, Commerce disavowed 20 years of precedent and created a new approach which it applied in so stilted a manner as to exclude one-half of the POR from the analysis"), 35-36 (referring to Commerce's "new-found criteria for multiple cost-averaging periods," and criticizing agency for adding further, additional "secondary tests" which did not "constitute[] a test for quarterly cost in any previous case, nor were they grounds for Commerce's denial of quarterly cost in the final results of the underlying review"), 39 (arguing that "[w]hen Habas established that the[ ] facts brought this case within the then-prevailing single-primary-input test for multiple averaging periods, Commerce changed the test"); Pl.'s Reply Brief at 9 (noting that eight factors cited by Commerce in Remand Determination "have never been posited as tests for shorter costing periods").

[9]At one point, for example, the Government argues:

general observation that presumably *all* litigants take their positions with an eye toward promoting

their own self-interests. *See* Pl.'s Reply Brief at 7-8. In this case, however, it is not much of a

stretch to view the Government's efforts to impugn Habas as a classic case of "the pot calling the

kettle black." As noted above (and discussed in greater detail below), Commerce's test for multiple,

shorter cost-averaging periods has been such a moving target that one might be forgiven for

wondering whether, in fact, in this case it is the Government (specifically, Commerce) that is

pursuing a (questionably) single-minded agenda – in other words, whether it is actually Commerce

that has a "result in search of a rationale."[10]

The fourth, and final, threshold observation is also related to the second – *i.e.*, the apparently

still-evolving nature of Commerce's test for the use of multiple, shorter cost-averaging periods.

Commerce has (to put it most charitably) sought to reformulate and refine its test for the use of

multiple, shorter cost-averaging periods over the course of these proceedings; but – at the same time

– Commerce and the Government (and, to a somewhat lesser extent, the Domestic Producers) seek

---

> In this case, Habas is unhappy with the results. However, if Habas's United States
> sales all had been in the third and fourth quarters of the period of review, Habas
> presumably would not be challenging Commerce's application of its annual-based
> methodology.

Def.'s Response Brief at 12. Elsewhere, the Government argues that "Habas is simply . . . taking
a 'results-oriented' approach to selecting a comparison period." *See* Def.'s Response Brief at 17.

[10]Indeed, in the initial briefing in this action, Habas charged that Commerce had "a margin
in search of a rationale." *See* Habas, 31 CIT at ____, 2007 WL 3378201 * 4 (*quoting* Habas' reply
brief); *see also*, *e.g.*, Pl.'s Reply Brief at 15 (asserting that Commerce here "continues to . . .
chang[e] its criteria at each stage of the proceeding to fit the results it wishes to achieve," and
arguing that "[t]he government has now demonstrated its unyielding commitment to its result
regardless of the evidence, and . . . has shown that it will simply continue to create new tests in an
effort to support its foreordained conclusion if given the opportunity to do so").

to confine Habas to the administrative record developed *before* Commerce fully defined and

articulated the (still, frankly, rather amorphous and unclear) criteria that the agency now seeks to

apply.  *See*, *e.g.*, Remand Determination at 26-27 (noting Domestic Producers' arguments that

agency should refuse to consider various authorities cited by Habas to demonstrate that 5% to 10%

difference in COM is significant), 30-31 (stating that "Habas' reliance on information which is not

on the administrative record before the agency is inappropriate and [Commerce] will not address this

line of argument further").[11]   There is thus an obvious issue of fundamental fairness, to which

Commerce and the Government (and, to a somewhat lesser extent, the Domestic Producers) seem

to turn a blind eye.

---

[11]*See also* Def.'s Response Brief at 18-19 (objecting that Commerce has had no opportunity to address Habas' argument concerning monthly or quarterly application of 25% market distortion benchmark used in agency's hyperinflationary economy analyses), 20 n.4 (arguing that it was proper for Commerce to refuse to consider sources cited by Habas concerning definition of "significant" difference), 25 (arguing that Habas' "correlation coefficient" argument should be disregarded because "Commerce has never seen these tables and never had the opportunity to respond to this complicated analysis"); Def.-Ints.' Reply Brief at 4 (asserting that Habas should not be permitted to argue for monthly application of Commerce's 25% market distortion benchmark used in agency's hyperinflationary economy analyses, because point "was not raised or argued by Habas before the agency"), 4 n.4 (arguing that Commerce "acted reasonably, and consistently with the [statute], in determining not to consider information that was not on the record, not relevant to the period of review, not relevant to Habas' cost of production during the period of review, and [which] did not address the propriety of multiple cost-averaging periods"), 7-9 (arguing that Habas' "correlation coefficient" argument should be disregarded).  *But see* Pl.'s Brief at 24-26 (arguing that Commerce erred in disregarding "external evidence" cited by Habas concerning "significance" of "changes in cost of 5 to 10%," and noting, *inter alia*, that "Commerce does not hesitate to cite later-developed precedent when it so desires"); Pl.'s Reply Brief at 14 (asserting that Commerce's reference to "close correlation" in Remand Determination "opened the door" for Habas' "correlation coefficient" argument).

1.  <u>Commerce's Evolving Test for Use of Multiple Cost-Averaging Periods</u>

When the underlying administrative review began, Commerce's then well-established test

for the use of multiple cost-averaging periods in cases involving ordinary industrial products (such

as the rebar at issue here) "focused on the behavior and economics of the respondent," inquiring:

(1) whether the product at issue had a "single primary input," and (2) if so, whether the cost of that

single primary input experienced a change during the POR that was of a quality and magnitude to

warrant the use of multiple, shorter cost-averaging periods (*i.e.*, less than a full POR).  If those two

criteria were satisfied, and if the respondent's changes in prices tracked changes in costs, Commerce

used multiple cost-averaging periods. *See generally* Pl.'s Brief at 6; *see also id*. at 2.  As Habas puts

it, "[t]he core issue was whether costs had increased or decreased markedly across the POR." *Id*.

at 6.

The Preliminary Results in the case at bar reflect Commerce's then well-established test, as

it was being applied by the agency at that time.  Specifically, Commerce stated in the Preliminary

Results:

> The Department has used monthly or quarterly costs in non-inflationary cases only
> where [1] there was *a single primary input* and [2] that input experiences *a
> significant and consistent decline or rise in its cost* during the reporting period.

Preliminary Results, 70 Fed. Reg. at 23,993 (emphases added).  Applying that then well-established

test, Commerce concluded in the Preliminary Results that Habas did not qualify for the use of

multiple cost-averaging periods:

> In this case, *because we do not find that the price of scrap* [*the single primary input
> in rebar*] *experienced a significant and consistent increase during the POR*, we have
> continued to follow [Commerce's] normal practice of using weighted-average POR
> costs for all respondents.

Preliminary Results, 70 Fed. Reg. at 23,993 (emphasis added).  In other words, Commerce implicitly

found in the Preliminary Results that Habas satisfied the first criterion – *i.e.*, Commerce found that

rebar is a "single primary input" product.  But Commerce also found that Habas had not

demonstrated that it satisfied the second criterion – *i.e.*, Commerce found that Habas had not shown

that the cost of the single primary input (scrap) had "experienced a significant and consistent

increase during the POR."

Habas briefed the issue extensively before the agency, seeking to demonstrate that it satisfied

Commerce's then well-established test for the use of multiple cost-averaging periods.  Specifically,

Habas argued that rebar is a single primary input product, that it had experienced a 28% increase in

material cost between the first and last quarters of the POR, and that such a change was of the type

and magnitude to qualify Habas for the use of quarterly costing.  *See generally* Pl.'s Brief at 7 (and

sources cited there).  Habas also sought to explain that Commerce's use of POR-average costing

resulted in mismatches in the normal value calculation by driving below cost many sales that were

actually well above cost at the time that they were made.  *Id*.

In the Final Results, Commerce apparently abandoned the well-established test that it had

applied in the Preliminary Results in this case, and in other, prior cases.  No longer was Commerce

focused on the existence and cost of a single primary input.  Nevertheless, relying on a seemingly

brand new test (and on a rather different rationale as well), Commerce once again concluded that

Habas did not qualify for the use of multiple cost-averaging periods:

> [Commerce] analyzed the significance of the change in the COM [cost of
> manufacturing], whether the change in cost occurred consistently and significantly
> throughout the POR, and whether the direct material inputs causing the cost
> fluctuation can be directly tied to the related sales transactions.  In this case, the

COM experienced by the respondents both decreased and increased during the first three quarters of the POR. It was not until the third and fourth quarters of the POR that the COM increased steadily. Because of this end of POR increase, the respondents claim that the COM for the first two quarters of the POR become inflated when using an annual average method, as compared to a quarterly average method. While we agree with the respondents that the annual average COM is higher than the quarterly average COM for the first two quarters of the POR, we disagree that the difference is significant. In analyzing this point, we first identified the 5 highest volume home market control numbers and examined the impact of using annual average costs of manufacturing versus quarterly average costs of manufacturing. We computed the difference in the cost of the input raw materials for the first two quarters of the POR using quarterly average cost data versus annual average cost data, and noted that in both instances, the difference ranged from approximately 5 to 10% of the COM. . . . In the past, [Commerce] has not considered one to 10% increases significant. *See* Pasta from Italy 1998-1999 Reviews. Therefore, we find the respondents' reliance on Thai Pineapple 1 and Thai Pineapple 2 irrelevant given that, in the instant case, we have found *no* significant change in the cost of scrap during the POR.

Decision Memorandum at 11-12.

As the excerpt above reflects, in stark contrast to the test articulated in the Preliminary Results in this case (and also applied in other, prior cases), Commerce in the Final Results here focused *not* on the existence and cost of a single primary input (*i.e.*, scrap), but, rather, on the total cost of manufacturing ("COM").[12] Moreover, rather than comparing the cost at the beginning of the POR to the cost at the end of the POR (as Commerce had done in the past, both in the Preliminary Results in this case and in other, prior cases), Commerce instead compared Habas' actual quarterly COM to Commerce's calculated POR-average COM. In essence, rather than comparing costs at two

---

[12]Although Commerce's analysis in the quoted excerpt focuses on the total cost of manufacturing ("COM") (rather than only on the cost of scrap), it is curious that the last sentence of the excerpt refers to "the cost of *scrap*." Decision Memorandum at 12 (emphasis added).

different points in time, Commerce instead compared the results of two different methodologies.[13]

As Habas observes, the effect of this change was to repudiate the agency's historic focus on "the

behavior and economics of the respondent" in favor of "an examination of the difference between

[two] competing methodologies" – an approach "completely different in kind from that of all

previous cases." Finding that the difference between the results of the two methodologies ranged

from 5% to 10%, Commerce then concluded – ostensibly relying on Pasta from Italy as precedent

– that a difference of 10% was not "significant." *See* Decision Memorandum at 12; *see generally*

Pl.'s Brief at 2, 7-8. On the strength of that analysis, Commerce determined that the use of multiple

cost-averaging periods was not warranted.

---

[13]In other words, rather than determining the "significance" of *the difference in Habas' costs* over the course of the POR, Commerce instead determined the "significance" of *the difference in the results calculated using one methodology versus another*. *See* Remand Determination at 7-8 (noting that Commerce "conducted a comparative analysis between the annual-average cost method and the quarterly-average cost method," and explaining how agency "compar[ed] the two methods"), 19 (stating that Commerce "compar[ed] the two cost methods (*i.e.*, annual-average cost method and the quarterly-average cost method)"), 22 (noting Habas' concern that Commerce's analysis "compares the end result of . . . two different cost reporting methodologies," rather than "compar[ing] the costs between the first and the fourth quarters of the POR"), 28 (acknowledging that Commerce here "compare[d] the difference between . . . two averaging methods"); Pl.'s Brief at 2 (pointing out that Commerce's analysis in this case "does not measure whether there is a significant increase in cost; rather, it measures the difference between two competing methodologies"; further noting that "[t]he focus of [Commerce's] approach has now changed . . . to an examination of the difference between competing methodologies"), 10-11 (explaining that Commerce's new approach "is to compare, during particular quarters, the quarterly [cost of manufacturing] with the POR-average [cost of manufacturing]," and "[i]f the difference between the two methodologies is not 'significant,' then Commerce will not apply multiple cost-averaging periods"); Def.-Ints.' Brief at 14 (noting that Commerce's new approach is to "compar[e] the results of . . . two methods (single and multiple period cost averaging)"); Def.-Ints.' Reply Brief at 3 (explaining, *inter alia*, that Commerce "measure[d] the difference between the quarterly and annual costing methodologies").

Habas challenged Commerce's Final Results in this action. In its initial briefs (filed pre-remand), Habas once again addressed the quarterly costing issue in detail, focusing primarily on the new test that Commerce had articulated and applied in the Final Results. Habas argued that the surge in scrap prices in the fourth quarter of the POR increased Habas' cost of manufacturing ("COM") by 21% across the POR. Habas further argued that – when quarterly costs were averaged across the POR – the surge in fourth-quarter COM created "fictitious profits and losses on home market sales," violating the rule of Brass Sheet and Strip From the Netherlands, and artificially increasing normal value by 14.5%. And, significantly, Habas criticized Commerce's reliance on Pasta from Italy, explaining that Pasta from Italy simply does not stand for the proposition for which the agency cited it in the Final Results. *See generally* Pl.'s Brief at 8-9 (*citing* Notice of Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke the Antidumping Duty Order: Brass Sheet and Strip From the Netherlands, 65 Fed. Reg. 742, 747 (Jan. 6, 2000) ("Brass Sheet and Strip from the Netherlands"); RE: Certain Pasta from Italy (Period of Review: July 1, 1988 through June 30, 1999), Subject: Issues and Decision Memorandum for the Third Antidumping Duty Administrative Review; Final Results of Review, 2000 WL 1880666 (Dec. 13, 2000) ("Pasta from Italy"), at comment 18).

In particular, Habas explained that the gravamen of Pasta from Italy is that an increase in raw material cost of 10% to 12% between the beginning and the end of the POR is not significant, when costs increased for half of POR and decreased for the other half of the POR. But, notably, in Pasta from Italy, Commerce *was not* comparing the results of two different costing methodologies (as the agency did in the Final Results here). Thus, contrary to Commerce's implication in the Final Results

in this case, Pasta from Italy *does not* stand for the proposition that a 10% difference between two methodologies is "not significant." *See generally* Pl.'s Brief at 9.

In the course of the remand proceedings, Commerce reaffirmed that its new approach to deciding whether to apply multiple cost-averaging periods is to compare, during particular quarters, the quarterly cost of manufacturing (COM) with the POR-average COM. According to Commerce, if the difference between the results of these two methodologies is not "significant," the agency will not use multiple cost-averaging periods.

In the Draft Remand Results, Commerce summarized its new analysis:

> [W]e reviewed the precise impact of using Habas's quarterly-average COM approach versus [Commerce's] preferred annual-average COM method, and found that the difference of approximately 5 to 10% was not significant. *See* Final Results at Comment 1. Accordingly, Commerce found that using annual-average costs was consistent with [the agency's] practice, more predictable, and reasonable.

Draft Results of Redetermination Pursuant to Court Remand (Pub. Doc. No. 3) ("Draft Remand Results"), at 7. Habas points out that the language of the Draft Remand Results thus largely tracked the language of the (pre-remand) Final Results – with one significant difference: The Draft Remand Results omitted the Final Results' reference to Pasta from Italy. As Habas notes, that omission reflects Commerce's tacit admission that the agency's earlier reliance on Pasta from Italy was misplaced. *See* Pl.'s Brief at 11. The relevant language of the final Remand Determination parrots the language of the Draft Remand Results (quoted above), word-for-word. *See* Remand Determination at 8.

As noted above, in its briefs now before the Court, Habas complains that – notwithstanding the assurances that the Government gave in seeking a voluntary remand – Commerce failed to take

a "fresh look" at this issue during the course of the remand proceeding. *See* Habas, 31 CIT at ____, 2007 WL 3378201 * 5; *see also* Pl.'s Brief at 6, 10, 12. Habas asserts that, on remand, "Commerce simply restated the test for which it had previously been unable to articulate a rationale," and then – for good measure – sought to buttress that test with an additional "two evidentiary tests that purport[ ] to support the conclusion that Habas did not experience a significant increase in cost in the POR and that Habas' prices were not correlated closely with its [cost of manufacturing]." *See* Pl.'s Brief at 10.

According to Habas, "Commerce's criteria for whether to apply multiple cost-averaging periods, as developed in this case, remain selective, *ad hoc*, and unprincipled, unsupported by law or fact." *See* Pl.'s Brief at 10. And, as to the two so-called "evidentiary tests Commerce formulated in the remand," Habas contends that "the first actually supports quarterly costing, while the second has no substantive bearing on the issue at hand." *Id*.

## 2. The First Prong of Commerce's Test for Multiple Cost-Averaging Periods

As summarized above, Commerce's principal criteria for the use of multiple, shorter cost-averaging periods historically have been (1) whether the product was a "single primary input product," and (2) if so, whether the cost of that single primary input increased or decreased significantly across the period of review ("POR"). If a respondent satisfied those two criteria (which in the past together comprised the first, and the main, prong of Commerce's test for shorter cost-averaging periods), and if the respondent's changes in prices tracked its changes in costs (the second prong of the test as applied in the past), then Commerce used multiple, shorter cost-averaging periods, because use of the agency's standard annual POR-average costs would be distortive. But

Commerce approached this case quite differently.[14]

_____

[14]In the Remand Determination, Commerce seeks to contrast the facts of this case with those of cases in which multiple cost-averaging periods have been used. *See* Remand Determination at 14-16. But Commerce's attempts to distinguish those other cases are neither illuminating nor persuasive.

The Remand Determination asserts, for example, that multiple cost-averaging periods have been used only in cases where "a high technology product experienced drastic and consistent cost and price changes over a short period of time or *the respondent's COM changed significantly throughout the cost reporting period*." Remand Determination at 14 (emphasis added); *see also id.* at 16 (stating that "a significant change *in COM* over the cost period" may warrant multiple cost-averaging periods) (emphasis added). But, in fact, as Commerce itself acknowledges, the agency's analysis in other cases in the past has focused not on the significance of the change in the total cost of manufacturing (COM), but – rather – on the significance of the change in the cost of a "single primary input." *See* Remand Determination at 8-9.

Moreover, the great bulk of the Remand Determination's analysis of prior cases is devoted to distinguishing this case from "those cases which have involved high technology products such as dynamic random access memory, static random access memory or erasable programmable read only memory," where multiple cost-averaging periods have been used. *See* Remand Determination at 15. However, that is nothing but a straw man. Habas acknowledged from the start that this case involves only an "ordinary industrial product[]." *See* Pl.'s Brief at 6. Commerce's extended discussion of cases involving high technology products is thus mere "filler."

The Remand Determination's analysis of cases other than those involving high technology products is limited to a very brief discussion of a single case – Thai Pineapple. *See* Remand Determination at 15-16. Commerce utterly ignores other cases involving non-high technology products, such as Stainless Steel Coils from Korea, Pasta from Italy, and Brass Sheet and Strip from the Netherlands. *See* Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From the Republic of Korea, 64 Fed. Reg. 30,664, 30,674-76 (June 8, 1999); Notice of Amendment of Final Determination of Sales at Less Than Fair Value: Stainless Steel Plate in Coils From the Republic of Korea, and Stainless Steel Sheet and Strip in Coils From the Republic of Korea, 66 Fed. Reg. 45,279, 45,280 (Aug. 28, 2001); Pasta from Italy, 2000 WL 1880666, at comment 18; Brass Sheet and Strip from the Netherlands, 65 Fed. Reg. at 747.

Ultimately, the Remand Determination's rationale for distinguishing this case from others where multiple cost-averaging periods have been used comes down to little more than *ipse dixit* – Commerce's conclusory assertions that "the reasons for [using multiple cost-averaging periods] . . . do not apply to the facts of this case" and that "the exceptions for using a different cost-averaging period (*i.e.*, . . . a significant change in COM over the cost period . . . ) do not apply to Habas' situation in this case." *See* Remand Determination at 14, 16; *see also id.* at 14 (implicitly asserting

As the Remand Determination explains, as to the first prong of the test, Commerce conducted two different analyses. First, Commerce analyzed the difference between calculating Habas' costs on a quarterly basis *versus* calculating Habas' costs on an annual POR-average basis – in essence, seeking to determine the "significance" of the difference between using Commerce's standard POR-average costing methodology *versus* using a quarterly costing methodology (as Habas has proposed). *See generally* Remand Determination at 7-8, 28, 32. Commerce's analysis in this case thus represented a sea change from what the agency has done in such cases in the past. As noted above, Commerce historically has evaluated the "significance" of a respondent's actual changes in cost over the POR – *not* the "significance" of the difference between the results of two different costing methodologies (as Commerce did in the Remand Determination in this case). In effect, Commerce here fundamentally alters the nature of the first prong of its two-prong test for the use of multiple cost-averaging periods.

Second, in addition to its comparative analysis of the difference between the annual POR-average cost methodology and the quarterly-average cost methodology, Commerce also conducted a "price volatility" analysis. Specifically, Commerce analyzed Habas' home market rebar prices within each quarter of the POR as compared to fluctuations in Habas' costs, to attempt to gauge the extent of normal cost and price fluctuations in Habas' home market over a short period of time. *See*

that instant case is not one in which "the respondent's COM changed significantly throughout the cost reporting period"). (Of course, as discussed in greater detail herein, the Remand Determination largely eschewed analysis of the "significance" of the increase in Habas' costs over the POR, in favor of an analysis of the difference between the two competing costing methodologies. The bases for Commerce's assertions that Habas did not experience "a significant change in COM" are therefore somewhat unclear.)

In sum, the Remand Determination fails to distinguish this case in any meaningful way.

*generally* Remand Determination at 10-11, 29-30, 32.

Based on its two analyses, Commerce concluded in the Remand Determination that the use of annual POR-average costs was not distortive. *See generally* Remand Determination at 8, 10-11, 19, 28-30, 32-33. In particular, Commerce found that the difference between costs calculated on a quarterly basis *versus* on an annual POR-average basis was approximately 5% to 10%, which Commerce concluded was not a sufficiently significant difference between the two methodologies to warrant the use of quarterly costs. *See* Remand Determination at 8, 19, 28, 32. In addition, Commerce found, as a result of its price volatility analysis, that – in light of the magnitude of the fluctuation in Habas' home market sales prices within a given quarter – Habas' cost fluctuations over the course of the POR were "not unusual or significant." *See* Remand Determination at 10-11, 29-30, 32.

Habas attacks both of Commerce's analyses. Habas first argues that Commerce's analysis of "significance" in effect measures the wrong thing, by evaluating the significance of the difference between the end results of two competing costing methodologies, rather than the significance of the actual increase in Habas' costs over the course of the POR. *See generally* Pl.'s Brief at 2-3, 15, 23, 26; Pl.'s Reply Brief at 4, 9-11; Remand Determination at 22. *But see* Remand Determination at 25-26, 28-29; Def.'s Response Brief at 16-17; Def.-Ints.' Brief at 13-15, 21; Def.-Ints.' Reply Brief at 1. Further, Habas faults the Remand Determination's comparative analysis of the "significance" of the difference between the annual POR-average cost methodology and the quarterly-average cost methodology, on the ground that the analysis was limited to only two quarters of the POR. In addition, Habas dismisses Commerce's price volatility analysis as "fatally flawed." Pl.'s Brief at

20; *see also id.* at 2-5, 12-17, 19-24; Pl.'s Reply Brief at 12-13; Remand Determination at 23. *But*

*see* Remand Determination at 7 & n.1, 8, 10-11, 29-30, 32; Def.'s Response Brief at 15-17, 21-23;

Def.-Ints.' Reply Brief at 2-6.

### a. Commerce's Comparison of Two Competing Methodologies

Habas initially takes aim at Commerce's decision to evaluate "significance" in this case by

analyzing the "significance" of the difference between the use of two different costing

methodologies. Habas contends that Commerce instead should have evaluated the "significance"

of the increase in Habas' costs between the beginning and the end of the POR, as Commerce has

done in every other such case in the past. *See*, *e.g.*, Pl.'s Reply Brief at 10-11 (noting that change

in costs over POR "was specifically articulated as the test for a shorter cost-averaging period in

Pasta from Italy"; that "[i]n all of the precedents Commerce compared the costs across the POR; it

is the core of a long-standing and clearly-articulated test"; and that "if this test is met, then the

precedents require that costing be done on a shorter cost-averaging period precisely because POR-

average costing is distortive in an environment where cost is rising rapidly").[15]

---

[15]*See also* Pl.'s Brief at 2 (explaining that "[t]he precedents when this review was underway . . . required quarterly costing (or some other form of multiple cost-averaging periods) when the respondent's cost to acquire the input of a 'single-primary-input' product 'increased significantly' during the POR"), 3 (arguing that "the use of multiple averaging periods has always turned on whether the respondent experienced a significant increase in cost across the POR," and that "[t]he standard way of measuring this, and the way used in all the precedents, is to compare beginning cost with ending cost"), 6 (stating that, in the past, "the test for quarterly cost ('multiple averaging periods') for ordinary industrial products" was whether the "change in cost during the POR . . . was of a quality and magnitude to warrant application of costing on a period less than a full POR," and that "[t]he core issue was whether costs had increased or decreased markedly across the POR"), 23 (asserting that, "in every one of its previous single-primary-input multiple-costing-period cases," Commerce calculated difference between cost at beginning of POR and cost at end of POR; arguing

Habas allows that "Commerce's decision to analyze the difference in COM [cost of manufacturing] rather than in raw material cost [*e.g.*, a single primary input, as the agency has done in the past] does not seem unreasonable." Pl.'s Brief at 3. But, Habas maintains, Commerce should have evaluated "whether the COM increased (or decreased) significantly across the POR" – *not* whether there was a "significant" difference between the use of the two competing costing methodologies. *Id.*; *see also id.* at 15 (observing that "in all of the previous cases, Commerce analyzed the movement of cost *across* the period of review, whether the cost of a single input or the total COM").

---

that "[t]his is the normal manner of addressing the question of whether the difference between two figures is significant," and "there is no reason to change the method now"), 26 (noting that "Habas experienced a 28% increase in the cost of its single primary input across the POR," and observing that "[u]nder Commerce's long-standing approach, this would have satisfied the threshold inquiry for multiple cost-averaging periods"); Pl.'s Reply Brief at 4 (stating that "[i]n all the precedents, from Brass Sheet and Strip through Pasta from Italy, Fujitsu General and Thai Pineapple, the fundamental issue was always whether the respondent's cost had undergone a significant increase across the POR"), 9 ("In Brass Sheet, as in Pasta from Italy and SRAMs from Taiwan, Fujitsu General, . . . and Thai Pineapple, . . . the issue has been whether the respondent's costs experienced a significant increase (or decrease) in cost across the POR"), 10-11 (explaining that "the question of whether a change in cost over the POR was 'significant' has always been the key question underlying shorter cost-averaging periods"; "[t]his was the test applied in Brass Sheet, and it was specifically articulated as the test for a shorter cost-averaging period in Pasta from Italy"; "[i]n all of the precedents, Commerce compared the costs across the POR; it is the core of a long-standing and clearly articulated test. In fact, if this test is met, then the precedents require that costing be done on a shorter cost-averaging period precisely because POR-average costing is distortive in an environment where cost is rising rapidly"), 11 (noting that "comparing costs at the beginning of the POR to costs at the end of the POR . . . is precisely the way in which the test was applied in Brass Sheet, in Pasta from Italy, and in all the other cases involving shorter cost-averaging periods"); Remand Determination at 22 (discussing Habas' argument that Commerce should use the same analysis it has used in past cases – comparing costs at beginning of POR to costs at end of POR, and noting Habas' 28% increase in scrap costs over course of POR as well as Habas' 21% increase in cost of manufacturing ("COM") over course of POR).

In the Remand Determination, Commerce gave Habas' point short shrift:

> Habas continues to argue that the change in costs from the beginning of the POR to the end is the proper method for analyzing this issue. . . . Other than the change in cost resulting in a larger figure, this approach provides little use in assessing the issue at hand. To simply look at costs at two points in time fails to recognize all the production activity throughout the year. That is, it simply represents the cost at two specific points in the POR, and calculates the percentage difference between those two points. By calculating the percent difference in the COM based on two specific points of time, we would be ignoring both the volume and COP [*i.e.*, cost of production] occurring during the remaining time in the POR. Thus, . . . Habas' proffered analysis is [not] appropriate.

Remand Determination at 28-29; *see also id.* at 25-26; Def.'s Response Brief at 16-17; Def.-Ints.'

Brief at 13-15, 21. Commerce's treatment of Habas' argument is far too dismissive. Although the

parties differ as to the "significance" of the increase,[16] no party appears to seriously dispute that

Habas' costs escalated over the course of the POR (driven largely by a 28% increase in the cost of

scrap). Further, neither Commerce nor the Government nor the Domestic Producers contests Habas'

assertion that, in all previous cases, the first prong of Commerce's analysis focused on the

significance of the change in a respondent's costs over the course of the POR. And, as Habas aptly

observes, "Commerce never explains why a test that was appropriate for 20 years' of precedent is

suddenly irrelevant" (much less, as Commerce apparently contends, affirmatively misleading). *See*

---

[16]*See*, *e.g.*, Pl.'s Brief at 2 (arguing that Habas' 28% increase in scrap costs over course of POR is "clearly significant"); Pl.'s Reply Brief at 10 (emphasizing that "[e]*very way* of examining the data shows that costs at the beginning of the POR were lower than they were at the end") (emphasis added); Remand Determination at 9-11 (acknowledging that Habas experienced a 28% increase in its scrap costs over the course of the POR, but concluding, based on Commerce's price volatility analysis, that Habas' cost fluctuations "were not unusual or significant"); Def.'s Response Brief at 7 n.2 (acknowledging Habas' 28% increase in scrap costs over POR), 16 (conceding that "the cost of production at the beginning of the period of review was lower than at the end"), 21-23 (arguing that Commerce's price volatility analysis demonstrates that Habas' 28% increase in scrap costs was "not necessarily unusual or significant with respect to rebar prices in Turkey").

Pl.'s Brief at 15.

Although Commerce refers to it in the Remand Determination (in the excerpt quoted above) as "*Habas*' proffered analysis" (emphasis added), analyzing the change in cost across the POR in fact historically has been *Commerce's* approach to the analysis. To be sure, it is settled black letter law that an agency generally has the right to change its practices and methodologies. But it is equally well-established that the agency is obligated to fully explain and adequately justify any such changes. *See*, *e.g.*, NSK Ltd. v. United States, 510 F.3d 1375, 1381 (Fed. Cir. 2007). To the extent that Commerce is now repudiating its past practice, Commerce must expressly acknowledge that it is doing so, and provide a full explanation and justification for the change and for any new approach that the agency is taking. It has not yet done so here.

Commerce's justification as set forth in the Remand Determination is much too truncated for the sweeping, fundamental changes that Commerce purports to make to the criteria for the use of multiple cost-averaging periods. The Remand Determination barely acknowledges the longstanding agency criteria that Commerce seeks to supplant, and does not address even the most obvious questions about the changes to those criteria.[17]

For example, the Remand Determination fails to explain the rationale behind Commerce's traditional criteria for the first prong of the test for the use of multiple cost-averaging periods – the "single primary input" criterion, and the criterion of "a significant and consistent decline or rise in

---

[17]The Domestic Producers' attempts to supply the missing rationale are unavailing. It is well-settled that an agency's decision may only "be upheld, if at all, on the same basis articulated . . . by the agency itself." *See* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962).

. . . cost." *See* Preliminary Results, 70 Fed. Reg. 23,993. Disavowing the "single primary input" criterion, the Remand Determination states that "it is the total COM [cost of manufacturing] that matters, not simply one component of the total manufacturing cost, since it is the COP [cost of production] that is used in the sales-below-cost test," and that "[w]hile one input . . . may represent a significant portion of the COM . . . , the other costs incurred to manufacture the finished product are also important in analyzing the significance of cost fluctuations throughout the POR." *See* Remand Determination at 8-9. Similarly, disavowing the criterion of "a significant and consistent decline or rise in . . . cost" between the beginning and the end of the POR, the Remand Determination states that such an approach "simply represents the cost at two specific points in the POR." *See* Remand Determination at 29. Each of these propositions is self-evident, however, and could not possibly have only recently occurred to Commerce – thus calling into question the rationale behind the agency's original criteria, as well as the rationale for and the timing of the changes at issue here, and raising the spectre of unprincipled, *ad hoc*, result-oriented decisionmaking. *See*, *e.g.*, Pl.'s Reply Brief at 15 (arguing that Commerce has "demonstrated its unyielding commitment to its result regardless of the evidence," and predicting that agency "will simply continue to create new tests in an effort to support its foreordained conclusion").

Accordingly, this matter must be remanded to Commerce, to permit the agency to reconsider once again whether in this case it should evaluate the significance of the difference between the use of the two competing costing methodologies, or the significance of the increase in Habas' costs between the beginning and the end of the POR (as Habas urges). In addition, Commerce shall detail

the rationale behind the agency's original criteria (discussed above), as well as the rationale for and

the timing of any changes applicable in this case.[18]

b.  Commerce's Limitation of Its Analysis to Two Quarters

Even assuming that Commerce was not required to apply the first prong of the test for

multiple cost-averaging periods as the agency has applied it in past cases (*i.e.*, even if Commerce

was not required to base its determination on the significance of the increase in Habas' costs over

_____

[18]Although Commerce is not being expressly required to reopen the administrative record, the agency clearly has the discretion to do so if appropriate.  Moreover, depending on the criteria that the agency elects to apply on remand, considerations of fundamental fairness may invalidate the agency's action if the record is not reopened.

Further, nothing herein should be construed to suggest that Habas is precluded from challenging the validity of any recent change in agency criteria (either in the abstract or as applied to Habas in this case), if circumstances warrant.  It is one thing to say that an agency has the right to change its policies and practices for *prospective* application.  It is quite another to say that an agency can change horses mid-stream – much less do so repeatedly, and as to virtually every single aspect of a longstanding, multi-prong methodology and related criteria (as Commerce has done here).  *Cf*. Shikoku Chems. Corp. v. United States, 16 CIT 382, 387-89 & n.8, 795 F. Supp. 417, 421 & n.8 (1992) (and authorities cited there) (explaining, *inter alia*, that "[p]rinciples of fairness" prevented Commerce from changing its methodology in case there at bar, that "[a]dherence to prior methodologies is required in some circumstances," and that "[l]ong-continued methodologies naturally serve to provide the basis from which subjects of agency investigations adjust their behavior").

Finally, Habas renews its request for a directed remand requiring Commerce to recalculate Habas' dumping margin using Habas' quarterly costs (rather than POR-average costs), arguing – as noted above – that the agency "has now demonstrated its unyielding commitment to its result regardless of the evidence," and predicting that, given the chance, Commerce "will simply continue to create new tests in an effort to support its foreordained conclusion."  *See* Pl.'s Reply Brief at 15; *see also* Pl.'s Brief at 40 (requesting "an explicit instruction [to Commerce] to calculate the margin using Habas' quarterly costs as submitted").  Still, it cannot be said with assurance that a second remand would be futile.  *See generally* Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006).  Commerce is nevertheless reminded that no party is entitled to an unlimited number of bites at the apple.

the course of the POR), it does not necessarily follow that Commerce's analysis in this case must be sustained. Habas also argues, in the alternative, that – in evaluating the "significance" of the difference between the two competing costing methodologies – Commerce erred by confining its analysis to only two quarters (*i.e.*, the first and second quarters of the POR, when Habas made its U.S. sales). *See* Pl.'s Brief at 3-5, 12-17; *see also* Pl.'s Reply Brief at 11. *But see* Remand Determination at 7 & n.1; Def.'s Response Brief at 15-17; Def.-Ints.' Reply Brief at 3-4 & n.2.

As a threshold matter, Commerce's analysis in the Remand Determination at least appears to be inconsistent with the agency's asserted rationale for declining to compare "the change in costs from the beginning of the POR to the end" (as Habas urges). As quoted above, the Remand Determination essentially disavowed Commerce's longstanding practice of comparing "the change in costs from the beginning of the POR to the end" on the grounds that – according to Commerce – by "look[ing] at costs at two points in time," such an approach "fails to recognize all production activity throughout the year." *See* Remand Determination at 28-29. However, Commerce here compared quarterly cost to POR average cost in only two quarters of the POR. The Remand Determination fails to explain how an analysis that is limited to only two quarters "recognize[s] all production activity throughout the year." *See generally* Pl.'s Brief at 3, 12-16.

Further pressing its challenge to Commerce's logic, Habas argues that – if Commerce's intent is (as stated) to "recognize all the production activity throughout the year" – Commerce must extend its analysis beyond the first two quarters, to include all four quarters of the POR. *See generally* Pl.'s Brief at 3, 12-16. Habas protests that "Commerce's examination of only the two quarters in which Habas had US sales underscores the *ad hoc* nature of [the agency's] exercise."

Pl.'s Brief at 14. And Habas asserts that the difference of approximately 5 to 10% which Commerce finds "not significant" in the Remand Determination "arises solely because Commerce chooses not to run its analysis across the entire POR." *Id*.; Remand Determination at 8, 28.

According to Habas, extending Commerce's analysis to all four quarters of the POR demonstrates that "the full spread of the difference between POR-average cost and quarterly cost is 20%" and that "the increase in quarterly cost across the POR is 21%." *See* Pl.'s Brief at 13-14; *see also id*. at 3. Habas thus concludes that, assuming *arguendo* the validity of Commerce's approach of evaluating the significance of the difference between the results of two different methodologies, and extending that approach to the full year of the POR (in accordance with Commerce's stated goal of "recogniz[ing] all the production activity throughout the year"), Commerce's own methodology would show that the difference between quarterly cost and average cost, measured across the entire POR, is actually 20% – *not* a "difference of approximately five to ten percent," as the Remand Determination indicates. *See* Pl.'s Brief at 3, 13-15; Remand Determination at 8, 28. No party directly addresses Habas' point. *See* Def.'s Response Brief at 16 (acknowledging, but not responding to, Habas' argument); *see also* Def.-Ints.' Reply Brief at 3 n.2.

In the Remand Determination, Commerce states that the agency limited its analysis to the two quarters in which Habas had U.S. sales "simply because those are the only quarters where contemporaneous comparison market sales would be used in the dumping margin calculation." Remand Determination at 7 n.1; *see also* Def.-Ints.' Reply Brief at 3-4. However, Commerce nowhere explains how an analysis which was limited to *the first and second quarters* of the POR took into account "the surge in [Habas'] cost in *the fourth quarter*" of the POR. *See* Pl.'s Brief at

4 (emphasis added). According to Habas, "[e]xamination of the quarters when US sales were made, in isolation from the rest of the POR, conceals the full impact of POR average cost versus quarterly cost." *Id*.

Habas asserts that, by comparing quarterly cost to POR average cost in only two quarters of the POR, Commerce fundamentally loses sight of "the central proposition" underlying the use of multiple cost-averaging periods in appropriate cases. Pl.'s Brief at 15-16. As Habas notes, the *raison d'etre* for multiple cost-averaging periods "is the concern about a *mismatch* between sales and cost," such as the mismatch that Habas alleges here – a mismatch between sales in one quarter of the POR and the cost of production much later in the POR. *Id*. at 16. In the Remand Determination, Commerce acknowledges that its test for the use of multiple cost-averaging periods should be designed to "determin[e] whether there is a temporal mismatch between sales and costs." Remand Determination at 29. But Commerce accuses Habas of "oversimplif[ying] the issue," asserting that "[t]he difficulty in this case is to determine at what point the fluctuation in costs is significant enough to depart from [the agency's] normal annual average method." *Id*. The Remand Determination asks rhetorically: "Is a 10-percent difference in costs between an annual average method and a quarterly average method the tipping point? Is it 15 percent?" *Id*.

As Habas notes, Commerce seems to intimate that, because of the difficulty in identifying a precise "tipping point," multiple cost-averaging periods can never be justified. *See* Pl.'s Brief at 16. Commerce stops short of throwing the baby out with the bath water, however. Habas' point is nevertheless well-taken. Commerce here makes no effort to define the "tipping point" which would warrant the use of multiple cost-averaging periods under facts such as those in this case – much less

to establish a standard to govern other cases, to ensure that similar cases are treated similarly. Instead, Commerce contents itself with indicating that, whatever may be the agency's standard (or "tipping point"), it is not met in this case.

Habas is not entirely unsympathetic to Commerce's plight in identifying a precise "tipping point."  But Habas notes that the problem that Commerce faces is essentially one of the agency's own making: "For nearly 20 years before the Turkish rebar case, Commerce had a consistent and predictable test [for the use of multiple cost-averaging periods].  For normal industrial products, the single-primary input criterion was workable. . . . [and the criterion of] whether [the] cost of the input had experienced a consistent and significant increase or decrease served well."  *See* Pl.'s Brief at 16-17 (footnote omitted).[19]  Notwithstanding the fact that Commerce apparently now seeks to jettison that longstanding test, Habas does not contend that Commerce must necessarily establish a precise "tipping point" here.  According to Habas, "for 20 years, Commerce had no hard numerical test, and it does not need one to administer the statute effectively."  *Id*. at 17.  However, Habas underscores that "[w]hat *is* required" in this case "is a principled approach," rather than what seems in critical respects to be "*ad hoc* and selective decision-making."  *Id*. (emphasis added).[20]

_____

[19]Habas notes that Commerce first used multiple cost-averaging periods in the 1986-88 review of Brass Sheet and Strip from Italy.  See Pl.'s Brief at 16 n.3 (*citing* Certain Brass Sheet and Strip From Italy; Final Results of Antidumping Duty Administrative Reviews, 57 Fed. Reg. 9235 (March 17, 1992)).

[20]As discussed above, Habas points out that – in the Remand Determination – Commerce has abandoned its reliance on Pasta from Italy as authority for the proposition that a difference between competing costing methodologies of approximately 5% to 10% is "not significant."  *See* Pl.'s Brief at 11, 23, 26 (discussing Pasta from Italy, 2000 WL 1880666, at comment 18).  Habas notes that Commerce cited that case as precedent in the Final Results.  As Habas correctly observes, however, the gravamen of Pasta from Italy is that a 10% to 12% increase in the cost of semolina over the

As the discussion above makes clear, the Remand Determination fails to adequately address Habas' numerous challenges to the logic and substantive validity of Commerce's analysis and determination as to the first prong of the agency's test for the use of multiple cost-averaging periods, as applied in this case.  Nor does the Remand Determination adequately address the substantive merits of Habas' other basic claims (taking into consideration matters such as the agency's past practice, and the fundamental policy underlying the use of multiple cost-averaging periods) – *e.g.*, Habas' assertions that the use of "POR-average cost masks the 21% cost increase that occurred across the POR, it forces virtually all first- and second-quarter sales to go below cost, it inflates normal value by 14.5%, and it inflates the dumping margin by some 20 percentage points." *See* Pl.'s Brief at 17.  *But see* Remand Determination at 18-19 (concerning 14.5% increase in normal value). Contrary to Commerce's claims, the Remand Determination does not establish that the use of POR-

---

course of the POR is not significant.  Commerce in that case *did not* evaluate the significance of the difference between two competing costing methodologies (as the agency did in both the Final Results and the Remand Determination here).  Pasta from Italy thus does not stand for the proposition that a 5% to 10% difference between the results of two competing costing methodologies is "not significant." *See generally* Pl.'s Brief at 8-9; Remand Determination at 24-25. *But see* Def.-Ints.' Brief at 15-16 (acknowledging that Pasta from Italy "compared the difference in the cost of semolina over the POR, rather than the difference between quarterly and POR-wide costs," but arguing that the case nevertheless supports Commerce's decision in the Remand Determination); Remand Determination at 27 (summarizing Domestic Producers' position as to relevance of Pasta from Italy).

As Habas emphasizes, the Remand Determination identifies no precedent or other authority for Commerce's determination that a difference between competing costing methodologies of approximately 5% to 10% is "not significant." *See* Pl.'s Brief at 11.  On remand (as discussed further below), Commerce shall detail its rationale for its determination that any particular difference is or is not sufficiently "significant" so as to warrant the use of multiple cost-averaging periods, and shall ensure that its determination is supported by substantial evidence in the record and justified by reference to the agency's past practice and its determinations in other cases (as well as any other relevant authority).

average cost is "more accurate" than quarterly costs in this case. *See* Remand Determination at 6. Commerce's determination thus cannot be sustained on this record.

As section III.A.2.a explains, this issue must be remanded to Commerce once again, for further consideration by the agency. On remand, Commerce shall reconsider the substantive merits of the first prong of its current analysis as reflected in the Remand Determination – in particular, the legitimacy of its evaluation of the significance of the difference between two competing costing methodologies (including its limitation of its analysis to only two quarters of the POR) – taking into consideration (and specifically addressing) each of Habas' claims. Thus, to the extent that Commerce adheres to its current analysis (or to the extent that the matters otherwise remain relevant), Commerce shall explain, *inter alia*, how its analysis (limited to only the first two quarters of the POR) recognizes all production activity throughout the year, and how the analysis takes into account the surge in Habas' costs in the fourth quarter of the POR. In addition, Commerce shall specifically address the validity of Habas' extension of Commerce's analysis to all four quarters of the POR. Commerce shall ensure that its redetermination on remand sets forth the agency's rationale in detail and is supported by substantial evidence in the administrative record.[21]

---

[21]As indicated above, Habas also makes the argument that – even if Commerce's approach in the Remand Results were to be sustained (*i.e.*, even if evaluating the difference in the results of two competing costing methodologies for only two quarters of the POR were determined to be a legitimate test for the use of multiple cost-averaging periods) – Commerce erred in concluding that a difference "of approximately five to ten percent" is "not significant." *Compare* Pl.'s Brief at 2-4, 17-27; Remand Determination at 23-25; *with* Remand Determination at 8, 19, 26-32; *see also* Def.'s Response Brief at 17-21; Def.-Ints.' Brief at 15-16; Def.-Ints.' Reply Brief at 2-4.

The remand mandated by the foregoing analysis (above) essentially obviates (at least for the moment) any need to reach the merits of Habas' claims as to the "significance" of any such difference. It is, however, worth noting that, in the Remand Determination, Commerce characterizes

the 25% market distortion benchmark used in the agency's hyperinflationary economy analyses as "[t]he only percentage threshold [cited by Habas] that is close to being on point here" (although Commerce goes on to assert that Habas could not satisfy a 25% standard in this case). *See* Remand Determination at 31-32; *compare* Pl.'s Brief at 4 (arguing that quarterly costing would be justified here under a standard of 25%, "as Habas' cost increase far exceeded 25% per annum (6.25% per quarter) during no less than half of the . . . POR"), 18-19 (arguing that "Commerce erroneously claims that the 25% threshold is not reached in the present case," and explaining that "application of the [25%] test for hyperinflation would require quarterly costing rather than POR-average costing in the present case," because "25% *annual* inflation implies 2.08% *monthly* inflation"), 23 (arguing that "[t]o reach its desired result, Commerce . . . ignores . . . its own consistent practice regarding hyperinflation"), 26 (arguing that Habas' "28% increase in scrap cost that drove the 21% increase in COM . . . more than satisfies the most closely related regulatory tests," including "the rule for hyperinflationary economies"); *with* Def.'s Response Brief at 18-20 (criticizing Habas' reliance on 25% benchmark, asserting that Habas' argument should be barred under the doctrine of exhaustion of administrative remedies, that "Commerce has always made hyperinflation determinations upon an annual basis and never upon a monthly or quarterly basis, as advocated by Habas," and that a 2.08% *monthly* threshold for use of shorter cost-averaging periods "would undermine Commerce's legitimate policy goal of using a consistent methodology that is predictable from case to case"); *and* Def.-Ints.' Reply Brief at 4 (criticizing Habas' reliance on 25% benchmark, asserting that Habas' argument should be barred under the doctrine of exhaustion of administrative remedies, and that use of that benchmark "would result in more cases being determined on multiple averaging periods . . . than not," and that "[Commerce's] 25 percent test for inflationary economies is annualized").

In a Notice of Subsequent Authority, Habas points out that – in the ninth administrative review of rebar from Turkey – Commerce expressly adopted by analogy that 25% threshold as the test for the use of multiple cost-averaging periods. *See* Notice of Subsequent Authority (Nov. 14, 2008) (*citing* Issues and Decision Memorandum for the Antidumping Duty Administrative Review on Certain Steel Concrete Reinforcing Bars from Turkey – April 1, 2006 through March 31, 2007, 2008 WL 4899081 (Nov. 3, 2008) ("Ninth Review Decision Memorandum"), at comment 2). Commerce there stated:

> While an increase of 25 percent in the cost of production during the POR, due to the rapid increase in the cost of a primary input, is not the same as high inflation, the 25 percent [benchmark used in the agency's hyperinflationary economy analyses] would be a reasonable percentage to establish the threshold for significance in this case. It is high enough to ensure that we do not move away from our normal practice without good cause and forgoing the benefits of using an annual average cost, but would allow for a change in methodology when significantly changing input costs are clearly affecting our annual average cost calculations.

Ninth Review Decision Memorandum, 2008 WL 4899081, at comment 2. Although Commerce determined that the respondent in question in the ninth administrative review did not meet the 25% benchmark, Habas asserts that the methodology that Commerce employed in the ninth review differs from that employed by the agency in the Remand Determination here, and that – if the methodology employed in the ninth review were used in this case – Habas *would* meet the 25% benchmark. *See* Notice of Subsequent Authority at 2; *but see* Def.-Ints.' Response to Notice of Supplemental Authority at 1 (disputing Habas' assertion).

The Government and the Domestic Producers strenuously object to any consideration in this administrative review of Commerce's methodology and standard in the ninth administrative review, arguing – in essence – that they were "not part of the administrative record considered by Commerce" in reaching its Remand Determination here. *See* Def.'s Response to Notice of Subsequent Authority; *see also* Def.-Ints.' Response to Notice of Supplemental Authority. However, this is not a case where a party seeks to supplement the record with additional "facts"; and Commerce's practices, methodologies, and standards are not themselves "evidence" *per se*. The Government's reliance on Hoogovens, Rhone Poulenc, and Becker is thus misplaced. *See* Def.'s Response to Notice of Subsequent Authority (*citing* Hoogovens Staal BV v. United States, 22 CIT 139, 143-44, 4 F. Supp. 2d 1213, 1218 (1998); Rhone Poulenc, Inc. v. United States, 13 CIT 218, 222, 710 F. Supp. 341, 345 (1989), *aff'd*, 899 F.2d 1185 (Fed. Cir. 1990); Becker Indus. Corp. v. United States, 7 CIT 313, 315 (1984)). *Cf.* Pl.'s Brief at 25-26 (arguing, as to related point, that "the agency had full discretion to consider its own findings from the immediately following period of review," that "[i]t would have been lawful and appropriate for Commerce to acknowledge the information and expertise it had gained in the interim between its first consideration of the 2003-04 review and its consideration of that review on remand," that the information cited by Habas "is part of Commerce's own published determinations in the review; it is the government's own determination on the record," and that "Commerce does not hesitate to cite later-developed precedent when it so desires").

In any event, as with the general issue of the "significance" of a difference of "approximately 5 to 10%," there is no need to here decide the implications (if any) for this case of Commerce's methodology and standards in the ninth administrative review. Commerce may consider the matter in the first instance on remand, as it reevaluates the proper methodology and standard to be applied in this case (just as Commerce may, if appropriate, consider any other relevant developments, including any ongoing efforts on the part of the agency to "develop a predictable methodology to determine when, due to the occurrence of significant cost changes throughout the . . . POR, the use of shorter cost-averaging periods would be more appropriate than the established practice of using annual cost averages"). *See* Ninth Review Decision Memorandum, 2008 WL 4899081, at comment 2 (*citing* Antidumping Methodologies for Proceedings That Involve Significant Cost Changes Throughout the Period of Investigation (POI)/Period of Review (POR) That May Require Using Shorter Cost Averaging Periods; Request for Comment, 73 Fed. Reg. 26,364 (May 9, 2008)).

3. <u>The Second Prong of Commerce's Test for Multiple Cost-Averaging Periods</u>

Commerce fares only slightly better on its analysis of the second prong of the test for shorter cost-averaging periods – *i.e.*, the linkage between Habas' costs and its sales prices. *See generally* Remand Determination at 6, 11-14, 33-40; *see also* Pl.'s Brief at 5, 27-38; Pl.'s Reply Brief at 1, 3-9, 11-14; Def.'s Response Brief at 8-15, 21-26; Def.-Ints.' Brief at 11, 17-21; Def.-Ints.' Reply Brief at 1, 6-13.

In the Remand Determination, Commerce explains that – even if the agency reached an affirmative determination on the first prong of its test for multiple cost-averaging periods (discussed in section III.A.2, above) – the use of quarterly costs nevertheless still would not be warranted absent "evidence of the direct linkage between the resulting quarterly-average costs and sales prices," because (compared to the agency's standard use of POR average costs to determine sales below cost) "a more accurate sales-below-cost test only results if the sales during the shorter averaging period can be directly linked with the [cost of production] during the shorter averaging

Finally, the broad nature of this remand similarly obviates the need to here parse the specifics of the parties' arguments as to the validity of Commerce's price volatility analysis, which the agency relies on to bolster its conclusion that Habas' cost increases were not sufficiently "significant" to warrant the use of quarterly costs. *See* Remand Determination at 10-11, 23, 29-30, 32; Pl.'s Brief at 4-5,19-23; Pl.'s Reply Brief at 12-13; Def.'s Response Brief at 17, 21-23; Def.-Ints.' Reply Brief at 2-3, 5-6. However, just as with all other issues subsumed in the first prong of Commerce's test for multiple cost-averaging periods, the parties are cautioned to exercise care on remand to ensure that a full record is developed on Commerce's price volatility analysis (to the extent that it remains relevant), and that all related arguments are fleshed out in detail.

Although Commerce is not being expressly required to reopen the administrative record, the agency clearly has the discretion to do so – and, indeed, should do so if necessary to ensure Habas' rights (as discussed more fully above).

period." Remand Determination at 11. Commerce notes that "[i]f one's objective is to determine whether sales within a given quarter were made above the cost to produce those same products in that quarter, production and sale should occur within the same quarter." *Id*.

The Remand Determination boldly concludes that, here, "there is *no evidence . . .* which supports the proposition that production costs in each quarter were directly related to those sales reported in that same quarter." *Id*. (emphasis added). Commerce overstates its case.

Habas provided Commerce with an analysis of its costs and prices over the POR, which Habas asserts demonstrates that its home market sales prices "precisely and consistently" tracked its costs in the same quarter, "lockstep." *See* Remand Determination at 12 (citation omitted). In the Remand Determination, Commerce faulted Habas' analysis in two respects, a critique to which Habas does not directly respond. *See* Remand Determination at 12-13; Pl.'s Reply Brief at 5-6; *see also* Def.'s Response Brief at 10; Def.-Ints.' Brief at 18; Def.-Ints.' Reply Brief at 7.[22]

To further evaluate Habas' claims of a "lockstep" relationship between its costs and its prices, Commerce looked to the price volatility analysis that the agency conducted on remand, discussed briefly in section III.A.2, above. *See generally* Remand Determination at 13, 33-34, 36-

---

[22]It is worth noting that one of Commerce's two criticisms was that, based on Commerce's determination in SSSSC from France, Habas' analyses should have compared quarterly indices of *total COM* [cost of manufacturing] (rather than just *scrap prices*). *See* Remand Determination at 12-13 (*citing* Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Stainless Steel Sheet and Strip from France (2003-2004), 2006 WL 297170 (Jan. 30, 2006) ("SSSSC from France"), at comment 2. But it is not clear from the record whether, in fact, Habas could fairly have been on notice that total COM – rather than scrap prices – was now the focus of Commerce's test. As the Remand Determination itself notes, SSSSC from France – apparently the case in which Commerce first focused on total COM, rather than a single primary input – was "a case that was conducted concurrently with this case." *See* Remand Determination at 9.

37; *see also* Def.'s Response Brief at 10-11, 21-23; Def.-Ints.' Reply Brief at 2 n.1, 7, 13 n.10. Commerce reasoned that, "[i]f Habas' quarterly home market prices and costs did in fact track each other in 'lockstep' . . . , one would expect [Habas'] quarterly profit percentage on home market sales to be consistent." Remand Determination at 36. However, the results of Commerce's analysis indicated that Habas' profits did not remain constant, as prices did not "increase in relatively the same amount as costs." *Id.* Indeed, Commerce found that "prices within a given quarter . . . fluctuate[d] by more than costs fluctuate[d] over the entire annual POR." *Id.* at 36-37.

Habas minimizes Commerce's price volatility evaluation as a mere "secondary analysis," with "no bearing on whether Habas' prices and costs were sufficiently correlated to warrant application of multiple cost-averaging periods." *See* Pl.'s Brief at 37. Even more to the point, Habas asserts that Commerce's analysis is methodologically flawed, in that it fails to account for the fact that Habas' sales database is prepared on a daily basis, while its cost database is presented on a quarterly basis. Thus, according to Habas, "[i]f the sales are not evenly distributed within a quarter, then the correlation with price will be diminished and . . . profitability will fluctuate." *Id.*; *see also* Remand Determination at 33. Neither the Government nor the Domestic Producers point to anything to refute Habas' critique.

The centerpiece of Habas' case on the relationship between its costs and its prices, however, is its "correlation coefficient" analysis. Specifically, Habas' brief uses data from the record – presented in the form of tables and graphs – to depict both the quarterly indices of price and cost for key product models during each quarter of the POR, and the actual quarterly prices and costs across the POR. *See generally* Pl.'s Brief at 28-35. Habas contends that "any fair comparison of the price

and cost curves . . . shows a substantial correlation between and costs across the POR." Pl.'s Brief

at 30. In fact, according to Habas, "the overall correlation coefficient between price and quarterly

[cost of manufacturing] for all [product models] is 0.9928, and for individual [models], the

coefficient of correlation is above 0.97 for all but one." *See* Pl.'s Brief at 30; *see also id*. at 30 n.8

(explaining that a correlation coefficient of 1 indicates a "perfect linear relationship" between two

variables).[23] Habas concludes that "a correlation coefficient of 0.992 definitively shows that price

and cost are closely correlated." *See* Pl.'s Brief at 31.[24]

---

[23]"CONNUMS" is the acronym for "control numbers," which refer to the precise "model numbers" of different types of the product at issue in an investigation (*i.e.*, in this case, the model numbers of different, specific types of rebar sold by Habas). *See* Remand Determination at 7; Def.-Ints.' Reply Brief at 5 n.5.

[24]On remand, Habas also sought to rely on a finding that Commerce made in a post-preliminary determination in the ninth administrative review of rebar from Turkey, which addressed U.S. industry allegations that Turkish producers had conspired to manipulate prices for scrap and rebar. Specifically, Commerce there concluded, *inter alia*, that Turkish producers keep inventory levels low to ensure that costs and prices are closely matched. *See* Remand Determination at 33 (citation omitted); *see also id*. at 23-24, 26-27, 30-31 (discussing same agency determination, in different context); Pl.'s Brief at 24-26 (same) (citing agency's post-preliminary determination by title and date, and noting that Commerce there also found that "home market prices . . . did appear to move with changes in the price of scrap" and, further, that "Commerce found a close correlation between the cost and price of rebar, not only for the Turkish industry, but for Habas in particular"); Def.'s Response Brief at 20 n.4 (discussing same agency determination, in different context); Def.-Ints.' Reply Brief at 4 n.4 (same).

The Remand Determination acknowledges Habas' reliance on that finding, but does not otherwise address it in any fashion. *See* Remand Determination at 33. Indeed, it appears that no party has specifically addressed the admissibility or relevance of that particular finding by Commerce, although the agency, the Government, and the Domestic Producers have objected to Habas' attempts to rely on the same determination for other purposes, arguing (in essence) that it is not part of the administrative record underlying the Final Results in the administrative review at issue here. *See* Remand Determination at 26-27, 30-31; Def.'s Response Brief at 20 n.4; Def.-Ints.' Reply Brief at 4 n.4.

In a related set of figures, Habas also depicts Commerce's POR average cost, graphically

illustrating the extent to which the use of POR average cost (as Habas puts it) "introduces significant

inaccuracies in every quarter," particularly in those quarters where the change in cost was most

pronounced. *See* Pl.'s Brief at 33-35. Based on the information presented in its tables and graphs,

Habas questions what Commerce could possibly mean when the agency finds that the use of POR-

average cost is "more accurate" than quarterly costs. *See* Pl.'s Brief at 35. According to Habas, the

evidence depicted in its brief demonstrates overwhelmingly that "[p]rice is correlated with quarterly

cost, while POR-average cost significantly distorts the price-cost relationship in every quarter of the

POR." Pl.'s Brief at 35.

---

Habas notes, however, that Commerce itself cites information that post-dates the Final
Results "when it so desires"; and "sauce for the goose is sauce for the gander." *See* Pl.'s Brief at
26 (*citing* Remand Determination at 4, which in turn cites a 2006 administrative determination by
Commerce in an entirely different proceeding). Moreover, as Habas emphasizes, the information
here at issue is a determination by Commerce itself, rendered in a closely-related proceeding. *See*
Pl.'s Brief at 25-26. And the general policy behind limiting parties in a case such as this to the
record compiled before the agency is not to give the agency *carte blanche* to take inconsistent
positions. Nor is the purpose of the policy to shield the agency from being required to explain
seeming discrepancies and disparities in its determinations, policies, procedures, practices,
methodologies, and standards. Finally, any potential for unfairness is minimized, if not entirely
obviated, where the parties to the two proceedings are the same (as appears to be the case here).

In the course of the second remand (ordered herein), Commerce will have the opportunity
to address Habas' reliance on the agency's finding in the post-preliminary determination in the ninth
administrative review that Turkish producers keep inventory levels low to ensure that costs and
prices are closely matched. In addition, Commerce will have the opportunity – more generally – to
reevaluate the appropriateness of considering in this matter other agency findings from that
determination as well as other similar determinations that Habas has cited, in light of the various
policy considerations (some of which are outlined above) underpinning the general principle that
parties' arguments must be confined to the administrative record.

Invoking the doctrine of exhaustion of administrative remedies, the Government and the Domestic Producers protest that Habas' statistical correlation argument should be disregarded on the grounds that it is "entirely new." *See* Def.-Ints.' Reply Brief at 7-9, 13 n.10; *see also* Def.'s Response Brief at 25. It is unclear, however, exactly what is assertedly "new" – Habas' reliance on the statistical concept of a correlation coefficient, Habas' use of graphic formats (*i.e.*, tables and graphs) to present record evidence, or something else.[25] Certainly neither the Domestic Producers nor the Government claim to be surprised by Habas' basic contention; as the Domestic Producers candidly acknowledge, Habas has consistently argued that "[its] cost and sales [prices] were sufficiently matched or correlated." *See* Def.-Ints.' Reply Brief at 8.

Moreover, as Habas points out, Commerce itself "opened the door" to Habas' correlation coefficient analysis by introducing the concept of "correlation" for the first time in the Remand Determination. *See* Pl.'s Reply Brief at 14; Remand Determination at 6 (stating that "there must be a close correlation between the costs to produce the product during the shorter period and the sales price of that same merchandise during the same period"). Further, the application of exhaustion principles in trade cases is a matter of judicial discretion. *See* Corus Staal BV v. United States, 502 F.3d 1370, 1381 (Fed. Cir. 2007) (and cases cited there); *see also* Def.-Ints.' Reply Brief at 8 (acknowledging that application of doctrine of exhaustion is committed to court's discretion).

---

[25]*See*, *e.g.*, Def.'s Response Brief at 25 (noting that "Commerce has never seen *these tables* and never had the opportunity to respond to *this complicated analysis*") (emphases added); Def.-Ints.' Reply Brief at 9 (emphasizing need for agency to have first opportunity to evaluate "[t]he type of *statistical analysis* Habas presents") (emphasis added).

On the merits of Habas' correlation coefficient analysis, the Government and the Domestic

Producers argue that even a perfect one-to-one correlation does not necessarily establish causation,

as a matter of logic. *See* Def.'s Response Brief at 11; Def.-Ints.' Reply Brief at 9-10. As the

Domestic Producers phrase their point: "[W]hile correlation coefficients measure the strength and

direction of a relationship between two variables, they do not demonstrate the cause of the

relationship, and in particular, cannot suffice to demonstrate that the correlation is caused by direct

temporal links between input costs and output prices within a quarter." *See* Def.-Ints.' Brief at 10.

The Government makes the same argument: "[E]ven if . . . costs and prices . . . moved in the same

direction, and . . . appeared to correlate to each other, it does not mean that one caused the other."

*See* Def.'s Response Brief at 11.

Habas argues that there has been no "substantive reply" to its "proof of a strong statistical

correlation between its costs and its prices," and that the absence of a "substantive refutation . . . is

an admission that Habas is correct." *See* Pl.'s Reply Brief at 1, 8, 11, 14. And, on a more basic

level, Habas questions the fundamental fairness of yet another constantly moving target – *i.e.*, a test

for cost/price relationship that initially required Habas to demonstrate a "*direct relationship*"

between its production costs and its sales within a quarter, which was then subsequently recast to

require proof of a "*correlation*," and which is now seemingly being transformed into a requirement

that Habas establish actual "*causation*."[26] Habas asserts that it is being singled out, and is, in effect,

---

[26]*See* Pl.'s Reply Brief at 14 (*quoting* Draft Remand Results at 11, where Commerce asserted that there was no evidence that production costs in a quarter were "directly related" to sales in the same quarter, as well as the Remand Determination at 6, where Commerce asserted that the test for multiple cost-averaging periods requires "a close correlation" between production costs and sales prices during the same period); *id.* at 7 (*quoting* Def.'s Response Brief at 11, which argues, *inter*

being forced to "satisf[y] a more rigorous test than any [ever] propounded previously for quarterly

costing."  Pl.'s Reply Brief at 8.[27]

The parties also debate the state of the record on Habas' purchasing, inventory management,

---

*alia*, "[t]he idea that correlation proves causation is a logical fallacy").

Even within the four corners of the Remand Determination, Commerce is at best fuzzy and imprecise (and arguably even inconsistent) as to the requisite relationship between production costs and sales prices within the proposed shorter cost-averaging period.  Then, of course, there is the further question of the consistency of Commerce's standard in this case with the standard that the agency has applied in other, prior cases.  *Compare*, *e.g.*, Remand Determination at 6 (asserting that "there must be a *close correlation* between the costs to produce the product during the shorter period and the sales price of that same merchandise during the same period") (emphasis added), 11 (arguing that "sales during the shorter averaging period" must be "*directly linked* with the COP [cost of production] during the shorter averaging period," and that "production costs in each quarter" must be "*directly related* to . . . sales reported in that same quarter"), 12 (requiring "a linkage of . . . sales prices and cost") (emphases added), 13 (examining "how well . . . quarterly prices and costs *track* each other," and whether "prices and costs are . . . , in fact, *moving in* '*lockstep*'") (emphases added), 14 (inquiring whether "prices and costs for the shorter periods" can be "*accurately matched*") (emphasis added), 33 (asserting that "production costs in each quarter" must be "directly related to the sales reported in that same quarter"), 35 (emphasizing that, in Brass Sheet and Strip from the Netherlands, respondent "linked its raw material input purchases to its related sales transactions in its normal books and records," and that its "monthly cost and price fluctuations were in 'absolute lockstep' with one another" and that "prices and costs for the shorter periods could be accurately matched"), 37 (asserting that, in Brass Sheet and Strip from the Netherlands, respondent "directly tie[d] input metal purchased to specific sales of subject merchandise").

[27]The Domestic Producers appear to go so far as to suggest that it would not be enough for Habas to prove that the merchandise that it sold within a quarter was produced from scrap purchased in the same quarter, but – rather – that Habas is actually required to establish the tie between "the input costs *for a given piece of rebar* and [the] sales price for that same piece."  *See* Def.-Ints.' Brief at 11 (emphasis added); *see also id*. at 17 (arguing that Habas "must show that *for a given piece of rebar*, the input costs (incurred during the shorter period) 'can be directly tied' with the sales price of that same piece of rebar in the same shorter period") (citation omitted) (emphasis added), 19 (arguing that Habas' evidence must "tie individual input purchases to particular sales"), 20 (asserting that Habas must produce "documentation sufficient to tie the input costs and sales prices *for each unit of rebar sold*," and must "link the input costs *for a given sale of rebar* to the sale price of that rebar in the same quarter") (emphases added); Def.-Ints.' Reply Brief at 6 (asserting that Habas must demonstrate that "the cost to produce . . . [a specific] piece of rebar can be directly tied to its sales price within the same quarter").

production, and sales practices, and what that record evidence actually shows vis-a-vis the

relationship between Habas' quarterly costs and sales prices. *See generally* Remand Determination

at 6, 11-13, 33-35, 37-40; *see also* Pl.'s Brief at 35-37; Pl.'s Reply Brief at 1, 4-9, 13-14; Def.'s

Response Brief at 10-15, 23-24; Def.-Ints.' Brief at 11, 17-20; Def.-Ints.' Reply Brief at 6, 12-13.

In the Remand Determination, Commerce seeks to contrast this case with Brass Sheet and

Strip from the Netherlands, asserting that – unlike the respondent in that case – Habas here cannot

"actually connect the merchandise [sold] during . . . [specific] quarters to merchandise produced

during the same quarters." *See* Remand Determination at 32; *see also id*. at 13-14, 35, 37

(comparing case at bar to Brass Sheet and Strip from the Netherlands, 65 Fed. Reg. 742). According

to Commerce:

> [T]he facts here are not similar to those in Brass Sheet and Strip from Netherlands,
> in which the respondent could make a contemporaneous comparison of metal values
> and sales prices which resulted in a more accurate calculation of the dumping margin
> in that instance because the respondent linked its raw material input purchases to its
> related sales transactions in its normal books and records. . . . The respondent in
> Brass Sheet and Strip from Netherlands was able to show [Commerce] that its
> monthly cost and price fluctuations were in "absolute lockstep" with one another. .
> . . Accordingly, in Brass Sheet and Strip from Netherlands, [Commerce] determined
> it appropriate to deviate from calculating costs on an annual-average basis over the
> entire cost reporting period because record evidence showed that cost fluctuations
> had a significant impact on the total COM during the period and prices and costs for
> the shorter periods could be accurately matched.

Remand Determination at 35.[28]

---

[28]Commerce and the Domestic Producers seemingly seek to enshrine Brass Sheet and Strip
from the Netherlands as the embodiment of the second prong of the test for the use of multiple cost-
averaging periods (*i.e.*, the linkage between cost and price), intimating that – to satisfy the second
prong of the test – Habas must be able to tie specific, individual purchases of raw material inputs
to specific, individual sales of its merchandise (as did the respondent in Brass Sheet and Strip). *See*,
*e.g.*, Remand Determination at 13-14, 35; Def.-Ints.' Reply Brief at 6-7. But no party contends that

In addition, although their exact status is far from clear, the Remand Determination identifies

eight factors which, according to Commerce, may "affect the relationship of . . . sales transactions

and costs":

> 1) the raw material inventory turnover period; 2) the inventory valuation method
> used by the company (*e.g.*, last-in, first-out versus first-in, first-out versus weighted-
> average, etc.); 3) the extent to which raw materials are purchased pursuant to long-
> term contracts; 4) whether finished merchandise is sold to order or from inventory;
> 5) the finished goods inventory holding period; 6) sales made pursuant to long-term
> contracts; 7) the extent to which monthly accruals are made; and 8) year-end
> adjustments . . . .

Remand Determination at 6; *see also id*. at 11-12.  Commerce reasons that, due to factors such as

these, "a shorter cost reporting period creates uncertainty as to how accurately the average costs

during the shorter period relate to the merchandise sold during that same shorter period," and that

"[s]imply shortening the cost-averaging period does not automatically result in a more accurate

comparison of sales and costs" so as to justify the use of multiple, shorter cost-averaging periods.

*See* Remand Determination at 39; *id*. at 12.

In the Remand Determination, Commerce found that Habas had addressed only three of the

eight identified factors, and that – even as to those three – the evidence was inconclusive:

> Habas' relatively short inventory holding period for billets [is not] evidence of a
> direct link between sales and [cost of production] in a given quarter. . . . While on
> average it appears from the turnover ratio Habas calculated that it generally holds
> billets in inventory for a short period of time, this does not establish when the scrap
> in inventory used to produce rebar was purchased.  Habas points to the only scrap
> purchase explicitly on the record as a spot contract. . . . However, one contract for
> one purchase during the POR does not qualify as evidence of the company's
> purchasing experience.  Lastly, Habas states that it does not sell to home market

such a requirement has been imposed in all other similar cases in the past; nor could any party
honestly so claim.

customers pursuant to long-term contracts which would appear to indicate a shorter lag time between date of sale and shipment. . . . However, the question of whether the shipped rebar was produced in the same quarter in which it was sold remains an open question with no direct answer on the record.

Remand Determination at 39-40.

Habas contends that Commerce and the Government fundamentally distort the holding and significance of Brass Sheet and Strip from the Netherlands (as well as its progeny), by relying on the case as authority ostensibly requiring proof that costs within the shorter cost-averaging period be directly linked to prices during that shorter period. *See* Pl.'s Reply Brief at 4, 6-7. According to Habas, "[t]his new-found 'test' was merely an evidentiary fact in Brass Sheet, and . . . was never even mentioned in Pasta from Italy, SRAMs from Taiwan, Fujitsu General, or Thai Pineapple." *See* Pl.'s Reply Brief at 4.[29] Habas emphasizes:

> [I]n Brass Sheet Commerce used a shorter cost-averaging period *because* costs increased significantly across the POR. The respondent passed its cost of brass through to the customer, but the core of the case was the *increase in cost* of brass across the POR.

Pl.'s Reply Brief at 6-7. Indeed, Habas asserts that "[i]n all the precedents, from Brass Sheet and Strip through Pasta from Italy, Fujitsu General and Thai Pineapple, the fundamental issue was always whether the respondent's cost had undergone a significant increase [or decrease] across the POR," and "whether that increase [or decrease] causes a mismatch between sales and costs when costs are averaged on a POR basis rather than calculated more contemporaneously with sales" – *not*

---

[29]*See also* Pl.'s Reply Brief at 9 (noting that "[i]n Brass Sheet, as in Pasta from Italy and SRAMs from Taiwan, Fujitsu General, . . . and Thai Pineapple, . . . the issue has always been whether the respondent's costs experienced a significant increase (or decrease) in cost across the POR . . . . Indeed, in all these cases except Brass Sheet, the entire issue of linkage between cost and price has . . . been conspicuously absent.").

whether costs within the shorter cost-averaging period were directly linked to prices during that same period. *See* Pl.'s Reply Brief at 4, 6-7.

Habas similarly takes the Government to task for its statement that Commerce rejected Habas' request for the use of quarterly costs "*due to* [the eight] factors" enumerated above. *See* Pl.'s Reply Brief at 8-9 (*quoting* Def.'s Response Brief at 13; emphasis added by Habas). Although Habas argued in its opening brief that the Remand Determination applied the eight factors as "individual *mandatory criteria* for multiple cost-averaging periods," Habas' Reply Brief treats the issue of the status of the eight factors rather differently. *Compare* Pl.'s Brief at 35-36 (emphasis added) *with* Pl.'s Reply Brief at 8-9. Specifically, Habas' Reply Brief characterizes the eight factors as merely "a group of secondary factors that Commerce occasionally cites as a counterweight to shorter cost-averaging periods." Pl.'s Reply Brief at 9.

Whatever significance Commerce now seeks to accord them, Habas emphasizes that "[t]here is no reference to [the eight] factors in the original Brass Sheet cases where the use of shorter cost-averaging periods originated," and that the eight factors "have never been posited as *tests* for shorter costing periods." *See* Pl.'s Reply Brief at 9 (emphasis added); *see also* Pl.'s Brief at 36 (asserting that none of the eight factors "constituted a test" for use of shorter cost-averaging periods in any previous case). Habas further maintains that "the eight secondary factors are absent from the Pasta [from Italy] analysis," and that "[i]n Brass Sheet as in Pasta from Italy and SRAMs from Taiwan, Fujitsu General, . . . and Thai Pineapple . . . , the issue has been whether the respondent's costs experienced a significant increase (or decrease) in cost across the POR." *See* Pl.'s Reply Brief at 9. In fact, Habas concludes flatly that "the eight factors have been irrelevant to the outcome" in each

of those cases.  *See* Pl.'s Reply Brief at 9.

In any event, Habas contends that – in the case at bar – Habas' correlation coefficient analysis renders the eight-factor "secondary test[] superfluous," and, moreover, that if Commerce nevertheless now requires evidence on the eight factors to establish a relationship between sales and costs within a given quarter, the onus was on Commerce to specifically request that Habas provide the necessary information.  *See* Pl.'s Brief at 36; *see also* Remand Determination at 37.

Commerce and the Domestic Producers correctly point out that, ordinarily, it is a party's responsibility to make its own case.  *See* Remand Determination at 38-39.[30]  But these are no ordinary circumstances.  As outlined above, the derivation of, and the standards or criteria for, the asserted second prong of Commerce's test for multiple cost-averaging periods (including the exact status of the eight factors) *even now* remain unclear.  A party is not required to proactively and affirmatively anticipate, and adduce evidence to satisfy, any and all potentially conceivable formulations of standards and criteria that an agency may possibly ultimately decide to impose. Commerce may not have been obligated to specifically request information as to the eight factors. But, if Habas must address the eight factors to establish a right to the use of quarterly costs, Habas was at least entitled to both clear, advance notice of the need to address the factors *and* an adequate opportunity to submit relevant evidence for the record.

---

[30]The Domestic Producers also object that "there is no [indication] . . . that Habas sought to place additional evidence on the record during the remand" to address the eight factors.  *See* Def.-Ints.' Reply Brief at 12.  But that argument has a very hollow ring, in light of the Domestic Producers' repeated and consistent objections to any attempts by Habas to supplement the record here or to rely on extra-record information not available at the time the Final Results issued.  *See*, *e.g.*, Def.-Ints.' Reply Brief at 4 n.4; Remand Determination at 26-27.  The Domestic Producers cannot fairly blow both hot and cold on such matters.

As to the merits, Habas argues that the existing record evidence addresses at least three of the eight factors, and establishes that Habas has a holding period of approximately one week for billet, that it has a holding period of less than a month for finished rebar, and that all of its home market sales are made directly from inventory on a "spot" basis (*i.e.*, not pursuant to long-term contracts). *See* Pl.'s Brief at 36-37; Pl.'s Reply Brief at 1, 6-7, 14. Habas contrasts that showing with Commerce's "bottom line" assessment of Habas' evidence – the Remand Determination's conclusion that "the question of whether the shipped rebar was produced in the same quarter in which it was sold remains an open question with no direct answer on the record." *See* Pl.'s Brief at 37 (*quoting* Remand Determination at 40). As Habas points out, as a matter of logic, "if [Habas'] billet holding period is a week and its rebar holding period is a month, and all sales are spot sales (with no long-term contracts), then every bit of evidence points to a lead time of less than a month between billet production and rebar sale. There is absolutely no evidence to the contrary." *See* Pl.'s Brief at 37; *see also* Remand Determination at 37-38.

On the other hand, the evidence that Habas cites (summarized immediately above) does not speak to one significant part of the equation – in particular, the issue of *when* Habas' purchases of scrap (and other relevant inputs, if any) were made. The Remand Determination specifically found that Habas had not "establish[ed] when the scrap in inventory used to produce rebar was purchased." *See* Remand Determination at 39; *see also id*. at 38 (noting Domestic Producers' argument that Habas' evidence on inventory management does not "link any scrap purchased to the product produced and sold within a quarter"); Def.'s Response Brief at 10 (speculating that "the raw material inputs used to manufacture . . . [specific] rebar were purchased at prices drastically different from

those in effect during the quarters when the sales were made"); Def.-Ints.' Reply Brief at 7 (hypothesizing that "rebar sold in a given quarter" could have been "produced out of inputs purchased prior to the quarter in which the sale occurred").[31]

The record on this particular point is not only thin, but also quite unclear. In finding that Habas had failed to "establish when the scrap in inventory used to produce rebar was purchased," the Remand Determination acknowledged that Habas had "point[ed] to the only scrap purchase explicitly on the record as *a spot contract*." *See* Remand Determination at 39 (emphasis added); *see also* Def.'s Response Brief at 24 (referring to scrap purchase contract on the record as a "spot contract[]"); Def.-Ints.' Reply Brief at 12 (same). Yet just two pages earlier, the Remand Determination stated that "the only scrap purchase on the record indicates that [the scrap] was purchased pursuant to *a long-term contract*." *See* Remand Determination at 37 (emphasis added). Those two statements by Commerce are irreconcilably in conflict.

---

[31]Habas quite properly points out that – as a practical matter – there is *always* some "carry-over," even when Commerce uses annual POR-average costs:

> Commerce's methodologies always involve an element of carryover from a previous period, because Commerce compares home market selling prices in the POR with the production costs incurred within the same period. This means that, *in every case, goods sold on the first day of the POR are treated as if they were produced within the POR, even if the goods sold from inventory on the first day were actually produced prior to the POR. Similarly, goods produced in the last days of the POR will almost always be sold in the following period, but the costs are applied in the period under review*. Thus, in every case, there are timing assumptions that affect both the beginning and the end of the period . . . .

Pl.'s Reply Brief at 4 (emphasis added).

Putting aside for the moment whether the scrap contract at issue was in fact a spot contract or a long term contract, Commerce determined, in any event, that a single contract was insufficient: "[O]ne contract for one purchase during the POR does not qualify as evidence of [Habas'] purchasing experience." *See* Remand Determination at 39; *see also* Def.'s Response Brief at 24; Def.-Ints.' Reply Brief at 12. Similarly, as to Habas' evidence concerning short inventory periods, the Domestic Producers argue that – even if it *is* the sole record evidence on Habas' production, inventory management, and sales practices – "in light of all the other record evidence suggesting that costs and prices are not directly linked, short inventory periods simply do not constitute substantial evidence." *See* Def.-Ints.' Reply Brief at 12-13; *see also* Remand Determination at 39 (finding that "Habas' relatively short holding period" is not "evidence of a direct link between sales and [cost of production] in a given quarter"). In the Remand Determination, Commerce concluded that Habas failed to "sufficiently address[ ] the [eight] factors," and that "[a]s any one of the [factors] . . . can have an impact on the accuracy of matching sales and costs during a given quarter, ignoring any one of them results in uncertainty." *See* Remand Determination at 39.

Although in other circumstances the question might be a much closer call, the fact that this matter must be remanded to Commerce on the first prong of the agency's analysis, together with the continued "morphing" of Commerce's test on this second prong (*i.e.*, the relationship between Habas' quarterly costs and its sales prices), tips the balance decisively in favor of returning this issue too to Commerce. Further, as the Government and the Domestic Producers point out, Habas' correlation coefficient analysis, in particular, "is necessarily fact-intensive and . . . woefully ill-suited for efficient review by the Court in the absence of an opportunity for the agency to first

evaluate the claim." *See* Def.-Ints.' Reply Brief at 9; *see also* Def.'s Response Brief at 25 (arguing

that "Commerce has never seen [Habas'] tables and never had the opportunity to respond to . . .

[Habas'] complicated [correlation coefficient] analysis, either in the underlying administrative

review, or in its response to Habas' comments to the draft remand [results]").

　　　A second remand will afford Commerce the opportunity to consider Habas' correlation

coefficient analysis in the first instance, in the light of all other relevant evidence of record.  In

addition, Commerce will have the opportunity on remand to clarify, clearly articulate, and properly

explain and support whatever methodologies, tests, or standards it determines to be applicable to

evaluate the relationship between quarterly costs and sales prices in this case (weighing, *inter alia*,

Habas' arguments here, the agency's past practice, and any other appropriate considerations and

developments), and to apply those methodologies, tests, or standards to the evidence herein (fully

articulating the rationale for its determination and supporting it with substantial evidence in the

record).  At the same time, Commerce shall ensure that Habas has adequate advance notice of all

relevant methodologies, tests, or standards, as well as sufficient opportunity to demonstrate its

satisfaction of them.[32]

---

　　　[32]Although Commerce is not being expressly required to reopen the administrative record,
the agency clearly has the discretion to do so if circumstances warrant.  Moreover, depending on the
methodologies, tests, and/or standards that the agency elects to apply on remand, considerations of
fundamental fairness may invalidate the agency's action if the record is not reopened.

　　　Further, nothing herein should be construed to suggest that Habas is precluded from
challenging the validity of any recent change in agency methodology or applicable tests or standards
(either in the abstract or as applied to Habas in this case), if circumstances warrant.  *See*, *e.g.*,
Shikoku Chems. Corp., 16 CIT at 387-89 & n.8, 795 F. Supp. at 421 & n.8 (and authorities cited
there) (explaining, *inter alia*, that "[p]rinciples of fairness" prevented Commerce from changing its
methodology in case there at bar, that "[a]dherence to prior methodologies is required in some

B.  Commerce's Determination on Date of Sale

Commerce's Remand Determination on the date of sale issue is the subject of a separate challenge, lodged by the Domestic Producers. *See generally* Def.-Ints.' Brief at 3-11, 21; Def.-Ints.' Reply Brief at 1, 13-15; *but see* Def.'s Response Brief at 4, 26-32.  Reversing its earlier determination in the Final Results, Commerce concluded on remand that the appropriate date of sale for Habas' U.S. sales is the date of contract. *See generally* Remand Determination at 1-2, 19-21, 40-49.  The Domestic Producers contend that the Remand Determination is not supported by substantial evidence and is otherwise not in accordance with law, because Habas did not submit *all* of its sales documentation to Commerce and because Habas assertedly failed to establish that the material terms of its contracts were not subject to change.  *See* Def.-Ints.' Brief at 3; Def.-Ints.' Reply Brief at 13-15.

The Domestic Producers urge that this issue be remanded to Commerce once again, arguing that the agency's use of contract date as the date of sale "utterly fail[s] to reflect the weight of either Departmental or judicial precedent."  Def.-Ints.' Brief at 4; *see also* Def.-Ints.' Reply Brief at 15. The Domestic Producers maintain that invoice date – rather than contract date – best reflects the date on which Habas and its U.S. buyers reached a meeting of the minds on the material terms of sale, and that invoice date therefore should be used as the date of sale for purposes of Commerce's antidumping duty analysis.  *See* Def.-Ints.' Brief at 3, 6-8, 10-11.  The Domestic Producers' arguments, however, are without merit.

---

circumstances," and that "[l]ong-continued methodologies naturally serve to provide the basis from which subjects of agency investigations adjust their behavior").

The antidumping statute on its face does not specify the manner in which Commerce is to determine the date of sale. However, by enacting the Uruguay Round Agreements Act, Congress "incorporated the trade agreements adopted by the World Trade Organization at the Uruguay Round negotiations into United States law." Allied Tube and Conduit Corp. v. United States, 24 CIT 1357, 1367-68, 127 F. Supp. 2d 207, 216 (2000). One such WTO agreement expressly provides that "[n]ormally, the date of sale would be *the date of contract*, purchase order, order confirmation *or* [*the date of*] *invoice*, *whichever establishes the material terms of sale*." *See* Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Art. 2.4.1 n.8 (emphases added). Further, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act expressly defines date of sale as the "date when the material terms of sale are established." *See* Statement of Administrative Action, H.R. Doc. No. 103-316, at 810 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153. Through the Uruguay Round Agreements Act and the Statement of Administrative Action, Congress thus "expressed its intent that, for antidumping purposes, the date of sale be *flexible* so as to accurately reflect *the true date on which the material elements of sale were established*." Allied Tube, 24 CIT at 1370, 127 F. Supp. 2d at 219 (emphases added).

Consonant with Congress' intent, Commerce's regulations provide that invoice date is the presumptive date of sale, but with an express caveat for situations where – as Commerce determined here – another date better reflects the date on which the material terms of sale were established:

> In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, *the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a*

> *different date better reflects the date on which the exporter or producer establishes*
> *the material terms of sale.*

19 C.F.R. § 351.401(i) (emphasis added).  In the Preamble to its date of sale regulation, Commerce

underscored that invoice date is merely the presumptive date of sale, and that the focus of an agency

date of sale analysis is to determine when the contracting parties reached a "meeting of the minds"

on the material terms of sale.  *See* Antidumping Duties; Countervailing Duties:  Final Rule, 62 Fed.

Reg. 27,296, 27,349 (May 19, 1997) (emphasizing that invoice date is merely the presumptive date

of sale, and that "[i]f the Department is presented with satisfactory evidence that the material terms

of sale are finally established on a date other than the date of invoice, the Department will use that

alternative date as the date of sale"; and noting further that the test for date of sale is when "the

terms are truly 'established' in the minds of the buyer and seller").

In the Final Results in this case, Commerce determined that Habas had failed to establish that

the material terms of sale were established as of the contract date.  *See* Decision Memorandum at

28-29; *see also* Remand Determination at 19-20.  The basis for Commerce's finding was a change

to the price specified in one of Habas' contracts, which was reflected in the form of a "billing

adjustment."  Decision Memorandum at 28; *see also* Remand Determination at 20.  Habas

maintained that the price change reflected in the billing adjustment was actually a penalty for late

delivery, specifically provided for under the terms of the contract, and thus was not a change to the

material terms of the contract.  *See* Habas, 31 CIT at ____, 2007 WL 3378201 * 6; *see also* Remand

Determination at 20.  The date of sale issue was remanded to Commerce in Habas, because – in

reaching its determination in the Final Results – Commerce had not considered Habas' explanation

for the billing adjustment, such that the record before the court in Habas "provide[d] no rationale

to serve as a basis for judicial review of the agency's action."  Habas, 31 CIT at ____, 2007 WL 3378201 * 7.

On remand, Commerce found that "the billing adjustment in question was, in fact, directly related to a late delivery clause contained in the contract between Habas and its U.S. customer." Remand Determination at 21.  Thus, absent any record evidence that the material terms of Habas' U.S. sales either had changed or were subject to change, and in light of the fact that there had been no such indication in any prior segments of the proceeding, Commerce reversed itself and concluded that – as  Habas had claimed all along – the date of contract was the appropriate date of sale for use in Commerce's antidumping analysis.  *See* Remand Determination at 21, 45, 48.  Commerce recalculated Habas' dumping margin accordingly.  *See* Remand Determination at 1-2, 21, 49.

The Domestic Producers attack the Remand Determination on two grounds.  Invoking Hornos Electricos, the Domestic Producers assert that, "[i]n order to overcome [the] regulatory presumption in favor of using invoice date as the date of sale, a party must: (1) 'produce sufficient evidence' by establishing a complete record that includes all relevant sales documents, and (2) demonstrate that the material terms [of its contracts] were neither changed nor subject to change during the POR."  Def.-Ints.' Brief at 5 (*quoting* Hornos Electricos De Venezuela, S.A. v. United States, 27 CIT 1522, 1537, 285 F. Supp. 2d 1353, 1367 (2003)); *see also* Def.-Ints.' Reply Brief at 13-15.  According to the Domestic Producers, Habas failed on both scores.  *See generally* Def.-Ints.' Brief at 3-11; Def.-Ints.' Reply Brief at 13-15.

Emphasizing that Habas provided complete documentation for only one sale,[33] the Domestic

Producers contend that Commerce lacked sufficient evidence to conclude that contract date is the

appropriate date of sale. *See* Def.-Ints.' Brief at 6-7. According to the Domestic Producers,

Commerce "has clearly stated that providing only a sample set of sales documentation . . . is not

enough to overcome the [regulatory] presumption . . . in favor of invoice date as the date of sale."

Def.-Ints.' Brief at 6 (*citing* Issues and Decision Memo for the Administrative Review of Oil

Country Tubular Goods from Korea - 8/1/97 through 7/31/98, 2000 WL 365756 (March 13, 2000)

("Oil Country Tubular Goods from Korea"), at comment 1). Indeed, the Domestic Producers go so

far as to argue that "the information necessary for justifying a move away from invoice date includes

provision of sales documents for *all* [period of review] U.S. sales." Def.-Ints.' Brief at 9 (emphasis

added); *see also id*. at 5 (asserting that party seeking date of sale other than invoice date must, *inter*

*alia*, "establish[ ] a complete record that includes *all relevant sales documents*" (emphasis added)).

As Commerce noted in the Remand Determination, however, "it is not the Department's

general practice to require respondents to submit complete sales documentation for all sales."

Remand Determination at 46-47 (referring to antidumping questionnaire). The instructions for

Section A of the antidumping questionnaire (issued to all respondents in an antidumping proceeding)

instruct respondents to provide "a copy of each type of agreement and *all sales-related*

---

[33]The Domestic Producers seek to make much of the fact that Habas had only three U.S. sales during the period of review, intimating that it would not have been unduly burdensome for Habas to submit (and for Commerce to review) all of Habas' sales documentation. *See* Def.-Ints.' Brief at 9 n.2. What the Domestic Producers overlook, however, is that the fact that only three U.S. sales are at issue means that the sample sales documentation that Habas submitted to Commerce actually represents *a full one-third* of Habas' U.S. contracts.

*documentation . . . for a sample sale*." *See* Remand Determination at 47 (emphasis added). Habas

here complied fully with those instructions.

The Domestic Producers assert that a respondent seeking a departure from invoice date as

the date of sale (*i.e.*, a discretionary adjustment) is obligated to provide additional evidence to

Commerce to satisfy its burden of proof, above and beyond the evidence required of respondents

in general. *See* Def.-Ints' Brief at 9 n.2. As a general proposition of law, that is indisputably true.

Commerce indeed is entitled to require such respondents to supply additional documentation, and

the agency has done so in the past where circumstances warrant – as illustrated by Oil Country

Tubular Goods from Korea and Certain Cold-Rolled and Corrosion-Resistant Steel from Korea, two

cases that the Domestic Producers cite as evidence of agency precedent. *See* Def.-Ints' Brief at 5-6,

9; Def.-Ints.' Reply Brief at 14; Oil Country Tubular Goods from Korea, 2000 WL 365756, at

comment 1; Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea:

Final Results of Antidumping Duty Administrative Reviews, 64 Fed. Reg. 12,927, 12,933-35 (March

16, 1999).[34]

---

[34]The Domestic Producers argue that, by not requiring Habas to submit complete documentation as to all U.S. sales, Commerce departed from agency precedent without the requisite reasoned explanation. *See* Def.-Ints.' Brief at 8 (*citing* Allegheny Ludlum Corp. v. United States, 24 CIT 452, 458, 112 F. Supp. 2d 1141, 1147-48 (2000)). However, contrary to the Domestic Producers' claims, this case does not represent a departure from "precedent" such as Oil Country Tubular Goods from Korea or Certain Cold-Rolled and Corrosion-Resistant Steel from Korea, the two cases on which the Domestic Producers rely. *See* Def.-Ints.' Brief at 6. Both cases are clearly distinguishable on their facts from the case at bar.

In Oil Country Tubular Goods from Korea, for example, there was record evidence of changes to material contract terms, as well as evidence indicating that some of the sample sales documents were incomplete. *See* Oil Country Tubular Goods from Korea, 2000 WL 365756, at comment 1. Commerce therefore requested full documentation from the respondent before

In contrast, in the instant case, Commerce found no indicia which prompted the agency to require Habas to submit further documentation. And the Domestic Producers cite nothing that suggests that Commerce in fact has required *all* respondents in similar cases in the past to produce complete documentation of *all* their U.S. sales; nor could the Domestic Producers do so.[35]

Apart from their contention that Habas should have been required to submit complete documentation as to all its U.S. sales, the Domestic Producers also argue that Habas failed to

---

considering any change to the use of invoice date as the presumptive date of sale. *See* Oil Country Tubular Goods from Korea, 2000 WL 365756, at comment 1; *see also* Remand Determination at 46.

Similarly, in Certain Cold-Rolled and Corrosion-Resistant Steel from Korea, Commerce requested additional sales documentation due to the "significant amount of time" between the "shipment [of goods] from Korea and invoicing of the unaffiliated customer" observed in prior reviews. *See* Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea: Final Results of Antidumping Duty Administrative Reviews, 64 Fed. Reg. 12,927, 12,933-35 (March 16, 1999) (explaining that "both the settling of essential terms of sale and the amount of time between shipment and invoicing are . . . relevant").

[35]The Domestic Producers assert that Commerce's failure to require submission of all of Habas' sales documentation is contrary to "judicial precedent," and intimate that Hornos Electricos and/or Allied Tube so held. *See* Def.-Ints.' Brief at 5 (*citing* Hornos Electricos, 27 CIT at 1537, 285 F. Supp. 2d at 1367; Allied Tube and Conduit Corp. v. United States, 25 CIT 23, 25, 132 F. Supp. 2d 1087, 1090 (2001)). But, contrary to the Domestic Producers' implication, no court has ruled that *all* respondents seeking to overcome the regulatory presumption on date of sale are required to submit *all* documentation as to *all* of their U.S. sales. *See* Nucor, 33 CIT at ____, 2009 WL 762367 * 32 (rejecting claim that respondent seeking to overcome regulatory presumption on date of sale is required to submit all documentation as to all of its U.S. sales, and noting that "a review of various cases in which Commerce has used a date of sale other than invoice date suggests that a number (if not all) of them involved administrative records that did not [include all documentation as to all of the U.S. sales at issue]").

Even more to the point, there is nothing whatsoever in the statute, or in the legislative history, or in Commerce's regulation which specifies that respondents seeking to establish a date of sale other than invoice date are required to submit all documentation as to all of their U.S. sales. Given the ease with which Congress or Commerce could have set forth such a hard-and-fast requirement had they wished to do so, their silence speaks volumes.

establish that the material terms of Habas' sales were not subject to change after the date of contract. *See* Def.-Ints.' Brief at 6-11; Def.-Ints.' Reply Brief at 14-15. In particular, the Domestic Producers point to a proprietary contract clause in Habas' sample sale documentation as evidence that material terms of Habas' contracts indeed were subject to change. *See* Def.-Ints.' Brief at 7, 10; Def.-Ints.' Reply Brief at 14-15.

There is no dispute, however, that Commerce was fully cognizant of the verbiage on which the Domestic Producers rely. Nor is there any dispute that Commerce analyzed that verbiage and made a studied determination that it did not "represent anything more than standard contract language," and that neither Habas nor its U.S. customer had in fact changed the contract at issue in any way. *See* Remand Results at 46-47. The Domestic Producers cite no evidence to the contrary – no facts, and no authority as to the legal effect of the language in question.

Apparently the Domestic Producers simply disagree with Commerce's determination that the clause at issue was mere routine contract "boilerplate," of no real significance.[36] But it is Commerce that Congress has charged with the administration of the antidumping statute; and it is Commerce that Congress has endowed with the discretion to use a date of sale other than invoice date when the agency determines that the other date better reflects when the material terms of sale were established. *See* 19 U.S.C. § 351.401(i); *see also* <u>Koyo Seiko Co. v. United States</u>, 551 F.3d 1286, 1292 (Fed. Cir. 2008) (determination as to sufficiency of proof "lies primarily within

---

[36]In essence, although the Domestic Producers view the proprietary contract clause as "evidence" that the material terms of Habas' contracts were subject to change, Commerce – exercising its expert judgment – determined that the clause *was not* such "evidence" of that fact. In other words, the contract clause would constitute "evidence" that material contract terms could change only if the clause was of significance; and Commerce here determined that it was not.

Commerce's discretion," particularly in case such as this, where the operative standard is "if the

Secretary is satisfied"); Def.'s Response Brief at 31 (*citing* Hornos Electricos, 27 CIT at 1535, 285

F. Supp. 2d at 1366-77); SeAH Steel Corp., Ltd. v. United States, 25 CIT 133, 134-35 (2001) (*citing*

Thai Pineapple Canning Industry Corp., Ltd. v. United States, 24 CIT 107, 109 (2000), *aff'd in part*

*and rev'd in part*, 273 F.3d 1077 (Fed. Cir. 2001)).

The Government underscores the extreme nature of the Domestic Producers' position on the

effect of the contract clause at issue:

> [E]ven if a company never modified its prices or other material terms . . . the
> existence of an unremarkable standard contract violation clause buried in an
> agreement between the company and its United States customer would require
> Commerce to apply date of invoice instead of date of contract, when, in fact, under
> any reasonable reading of the contract, the material terms were set [as of the date of
> contract].

Def.'s Response Brief at 31.  Neither the courts nor Commerce have ever applied such a restrictive

test.  *See* Nucor, 33 CIT at \_\_\_\_, 2009 WL 762367 * 33-34 (expressly rejecting claim that "the

regulatory presumption of invoice date can be overcome only if a foreign producer establishes that

there were *no changes whatsoever* to *any* material term of *any* contract at issue (and, moreover, that

there was *no possibility* of any such change"); Def.'s Response Brief at 31.  Rather, as the

Government notes, the courts have consistently recognized the expertise and discretion that

Commerce must necessarily exercise in making its fact-intensive date of sale determinations.  *See*

Def.'s Response Brief at 31.

The Domestic Producers protest that, on remand, Commerce "simply pretend[ed] that neither

the test nor the precedents exist."  Def.-Ints.' Reply Brief at 15.  But the Domestic Producers' rigid

position cannot be reconciled with the facts of this case or others in the past, which reflect

Commerce's case-specific approach to its date of sale determinations, and demonstrate the agency's flexibility in analyzing relevant facts (consonant with Congressional intent). *See* Issues and Decision Memorandum for the Antidumping Duty Investigation of Sulfanilic Acid from Portugal; Final Determination, 2002 WL 31493754 (Sept. 18, 2002), at comment 1 (using contract date as date of sale, even though the contract was subsequently renegotiated when certain production quantities could not be met); Circular Welded Non-Alloy Steel Pipe from the Republic of Korea; Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 32,833 32,836 (June 16, 1998) (finding that material terms of sale were fixed on contract date, where subsequent changes were usually immaterial in nature or, if material, rarely occurred, and where there was no information on the record indicating that terms of sale changed frequently enough to give buyers and sellers any expectation that final terms would differ from those agreed to in contract); Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Certain Welded Carbon Steel Pipes and Tubes from Thailand, 65 ITADOC 60,910 (Oct. 13, 2000), at comment 1 (using contract date as date of sale, even though quantity changed for virtually all contracts, and some changes exceeded contract tolerances).

Commerce's determination must be sustained "when it is reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence." Mitsubishi Materials Corp. v. United States, 17 CIT 301, 304, 820 F. Supp. 608, 613 (1993) (*citing* Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984)). Here, Commerce adequately explained its determination to use contract date as the date of sale for Habas' U.S. sales. Moreover, that determination is amply supported by the record evidence, and reinforced

by its consistency with the agency's determinations in other, prior cases.  Commerce's Remand Determination as to the date of sale for Habas' U.S. sales must therefore be sustained.

## IV.  <u>Conclusion</u>

For all the reasons set forth above, Commerce's Remand Determination must be sustained as to the agency's determination to use contract date as the date of sale for Habas' U.S. sales. However, the issue of the use of annual POR-average costs *versus* quarterly costs in Commerce's "sales-below-cost" analysis must be remanded to the agency once again, for further action not inconsistent with this opinion.

A separate order will enter accordingly.

/s/ Delissa A. Ridgway
_____

Delissa A. Ridgway
Judge

Dated:  June 15, 2009
       New York, New York